(No. 81443.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DELBERT HEARD, Appellant.

*Opinion filed June 17, 1999.—Rehearing denied October 4, 1999.*

40

46

HARRISON, J., concurring in part and dissenting in part.

Frederick F. Cohn, of Chicago, for appellant.

·James E. Ryan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (William L. Browers, Assistant Attorney General, of Chicago, and Renee Goldfarb, Barbara Jones and Nancy Faulls, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BILANDIC delivered the opinion of the court:

Defendant, Delbert Heard, was charged in the circuit court of Cook County with 12 counts of first degree murder, 6 counts of home invasion, one count of residential burglary, and one count of burglary. These charges related to the November 11, 1992, murders of Natalie Wilson, Kenneth Seals, and Zita Jones. Prior to defendant's trial, the State nol-prossed three counts of murder, three counts of home invasion, the residential burglary count, and the burglary count. The jury returned a verdict of guilty against defendant on three counts of first degree murder, and the trial court entered judgment on these counts. The jury returned a verdict of not guilty on the home invasion counts. Defendant filed a post-trial motion for judgment of acquittal or a new trial. The trial court denied defendant's motion.

Defendant waived a jury for the death sentencing hearing. The trial court found defendant eligible for the death penalty based upon the statutory aggravating factor that the defendant murdered two or more individu-

als. 720 ILCS 5/9—1(b)(3) (West 1992). After considering evidence in aggravation and mitigation, the trial court found no mitigating factors sufficient to preclude imposition of the death penalty and sentenced defendant to death.

Defendant's death sentence has been stayed pending direct review by this court. See Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rs. 603, 609(a). For the reasons that follow, we affirm defendant's convictions and death sentence.

### FACTS

The evidence adduced at trial showed that on November 11, 1992, Natalie Wilson, Natalie's 10-year-old daughter, Tanquinka (nicknamed TQ), and Natalie's cousin, Zita Jones, lived in a first-floor apartment behind a storefront at 136 East 118th Street in Chicago. At the time of the murders, Kenneth Seals was Natalie's boyfriend, and Natalie was pregnant with Kenneth's child. Natalie and Kenneth began their relationship in April of 1992. Previously, defendant (nicknamed Heavy) had been Natalie's boyfriend for approximately five years. Sometime in 1992, Natalie and defendant ended their relationship.

TQ testified that, on November 10, 1992, at approximately 8 p.m., defendant knocked on the front door of Natalie's apartment and asked if he could enter. Natalie, Kenneth, and TQ were all in the apartment. When Natalie told defendant that he could not come into the apartment, defendant replied, "I'm not going to hurt you." Defendant asked where TQ was, stating that he wanted to buy some of the candy that TQ was selling for a school fundraiser. Natalie told defendant that TQ was not home. Kenneth did not say anything to defendant. Defendant kicked the door and left.

TQ then bathed and went to bed. TQ's bedroom was next to Natalie's bedroom. There was no heat in TQ's

room because the radiator was in Natalie's room. The door that led from TQ's room to Natalie's room was therefore kept open. Later that evening, TQ heard the side door unlock, and heard Zita and her boyfriend talking and laughing. Zita and her boyfriend went into Zita's bedroom. TQ later heard Zita and her boyfriend walk back to the side door and unlock it. TQ heard the door lock again and then heard Zita walk back to her bedroom.

As TQ was going back to sleep, she heard the door unlock again, slower this time, and she heard the floor squeak. After hearing these noises, TQ saw defendant standing at the foot of Natalie's bed. TQ heard defendant exchange words with Natalie and Kenneth, and heard defendant say, "Don't try it." TQ heard gunshots and saw defendant lean over Natalie and Kenneth. According to TQ, defendant had a long black gun, and sparks were coming from it. TQ heard about 25 or 30 shots coming from her mother's room. TQ then heard Zita screaming and the floor squeaking again. Defendant went to Zita's room, and TQ heard more gunshots. TQ then heard the floor squeaking very fast and the outside gate rattle.

At this point, TQ arose from her bed and went into her mother's bedroom. TQ asked Natalie if she was okay. Natalie tried to lift her head but did not respond. Kenneth had been moaning, but the moaning stopped. TQ went to Zita's room. Zita was lying down with "a hole in her head" and "stuff" coming out of her neck.

TQ called the police and ran upstairs to get help from the landlords, Monique and Melvin DeYoung. Mrs. DeYoung testified regarding the events of the evening. On November 10, 1992, the DeYoungs went to sleep at approximately 10 p.m. They were later awakened by gunfire. Mrs. DeYoung heard heavy footsteps and then heard the kitchen door to Natalie's apartment slam. Mrs. DeYoung heard moaning from the first floor.

Mrs. DeYoung testified that TQ came into Mrs. De-Young's bedroom. TQ's eyes were "bugged," and she was shaking. TQ told Mrs. DeYoung that "somebody shot my mama" and "something" was coming out of Natalie's eye. TQ stated that she tried to wake Natalie and Kenneth, but that Natalie would not wake up, and Kenneth said "huh" and then died. TQ told Mrs. DeYoung that she next went to Zita's room, but Zita had "something" coming out of her eye and was dead.

TQ and Mrs. DeYoung went to Natalie's apartment. Paramedics and police officers were in the apartment. TQ tried to get back to Natalie. When the police officers would not let TQ into the area, TQ became very upset and began mumbling to herself. Mrs. DeYoung heard TQ say, "Man, why did Heavy shoot my mama?" When Mrs. DeYoung asked TQ if she saw defendant, TQ said, "Man, why did he shoot my mama? I didn't see nothing. I didn't see nothing Mrs. DeYoung." Mrs. DeYoung described TQ as "very shaken," "concerned," "frightened," and "in shock."

Mary Pearson, the common law wife of defendant's second cousin as well as the sister-in-law of Natalie, also testified regarding her arrival at the crime scene. When Mary entered the apartment, TQ ran to her and said, "Auntie Net, he gon killed my mother." When Mary asked TQ who killed Natalie, TQ hugged Mary but did not answer Mary's question. Mary and TQ then went with detectives in an attempt to find defendant. The group went to defendant's house, defendant's parents' house, defendant's sister's house, and the garage where defendant parked his tow truck. At each location, TQ lay down in the backseat of the car as if she did not want to be seen. When the detectives pulled up in front of defendant's parents' home, TQ told Mary, "He gon see us" and TQ began to cry. The day after the crimes occurred, defendant learned that the police were looking for him, and he then went to the police station.

Chicago Police Officer John Butler, a forensic investigator, testified regarding his processing of the crime scene. In one bedroom, Natalie and Kenneth's bodies were on the bed. In a second bedroom, Zita's body was on the bed. The victims had been shot numerous times. The police recovered a total of 32 cartridge cases from Natalie's apartment. All of the cartridge cases were 9-millimeter Luger FC. The police found a set of keys in the outside kitchen door. No fingerprints suitable for comparison were recovered from the keys. The police also found a Taurus .380 semiautomatic pistol on the window sill closest to Kenneth's body.

Assistant Chief Medical Examiner Dr. Mitra Kalelkar testified regarding her performance of the autopsies on the victims' bodies. The victims died from multiple gunshot wounds. Natalie and Zita were shot 5 times, and Kenneth was shot 17 times. Natalie was six to eight weeks pregnant.

After the prosecution rested, defendant presented the testimony of Alonzo Williams, Tina Coleman, and Kimberly Nelson. Alonzo Williams, defendant's friend, and Tina Coleman, defendant's fiancée, testified that they were with defendant on the night of the murders. Alonzo stated that on November 10, 1992, he met defendant and Tina at approximately 10 p.m. at a bowling alley. According to Alonzo, the group stayed at the bowling alley until 1:30 a.m. and then went to a restaurant until 2:30 a.m.

Tina testified that she was engaged to defendant, and that he is the father of her son. According to Tina, at 9:30 p.m. on November 10, 1992, defendant picked her up, and they met some of defendant's friends at a bowling alley. Tina stated that her sister paged her at about 1:30 a.m., and that she called her sister back from the bowling alley. Tina, defendant, and defendant's friends left the bowling alley at about 1:30 a.m. and went to a

restaurant, where the group stayed until 2:30 a.m. Tina stated that she and defendant went to a hotel because defendant had overnight company at his apartment. They stayed at the hotel until 7 a.m.

Kimberly Nelson, Tina's sister, testified that, on November 11, 1992, at about 1:30 a.m., she talked to Tina on the phone. Tina called Kimberly after Kimberly paged her. Kimberly stated that she could hear that Tina was at a bowling alley because she heard pins in the background. Kimberly also stated that she heard defendant talking in the background.

The jury returned a verdict of guilty against defendant on three counts of first degree murder. At this stage in the proceedings, defendant obtained a new attorney. Defendant's new attorney filed a post-trial motion for judgment of acquittal or a new trial. The trial court denied defendant's motion. Defendant waived a jury for the death sentencing hearing. The trial court found defendant eligible for the death penalty based upon the statutory aggravating factor that the defendant murdered two or more individuals. 720 ILCS 5/9—1(b)(3) (West 1992).

At the aggravation-mitigation phase of the death penalty hearing, the State presented a number of victim impact statements from the families of the victims. The prosecution also presented the testimony of Chicago Police Officer Allan Garant. Officer Garant testified that on October 11, 1989, he and his partner followed defendant and another individual. Defendant, with a coat hanger, made a downward motion near a car. Defendant opened the car door, and the other individual entered the car. Defendant stood near the car, moving his head from left to right, and looking around. Two to three minutes later, the individual exited the car, and he and defendant started to walk back to their car. Defendant was arrested for burglary and possession of burglary tools, and he later pled guilty to a reduced misdemeanor charge.

In mitigation, defendant called 12 individuals to testify and presented affidavits from 33 persons. These people included family, friends, business associates, school authorities and prior teachers, and inmates and jail personnel. All of these witnesses described defendant as a hardworking, caring, and nonviolent person. Defendant's family was described as close, supportive, and religious. Some witnesses recounted specific instances when defendant helped them during a financial or emotional crisis. Other witnesses relayed that defendant was never involved in a gang, and stayed away from drugs and alcohol.

The trial court recognized that a statutory mitigating factor existed, *i.e.*, that defendant has no significant history of criminal activity. See 720 ILCS 5/9—1(c)(1) (West 1992). After considering evidence in aggravation and mitigation, however, the trial court found no mitigating factors sufficient to preclude imposition of the death penalty and sentenced defendant to death for the murder of the three victims. Defendant now appeals his convictions and sentence.

## ANALYSIS

### I. *Batson* Claim

Defendant first argues that he was denied a fair trial because the State exercised its peremptory challenges in a racially discriminatory manner in violation of *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986). According to defendant, the State excluded five black venirepersons by peremptory challenges. The final jury included two black females, but no black males. We note that defendant is black, as were the three victims.

Challenges to the composition of a jury must be brought before the jury is sworn. See *People v. Fair*, 159 Ill. 2d 51, 71 (1994). In this case, defendant raised the *Batson* issue for the first time in his post-trial motion.

Defendant's failure to object in a timely manner to the prosecutor's peremptory challenges results in waiver of the issue upon review. See *Batson*, 476 U.S. at 99, 90 L. Ed. 2d at 89-90, 106 S. Ct. at 1724; *Fair*, 159 Ill. 2d at 71.

Defendant argues, however, that his trial counsel was ineffective for failing to preserve the *Batson* claim. To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) his defense counsel's performance was deficient and (2) there is a reasonable probability that, but for defense counsel's deficient performance, the outcome of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 694, 80 L. Ed. 2d 674, 693, 698, 104 S. Ct. 2052, 2064, 2068 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525 (1984). A court need not consider the deficiency prong where the defendant fails to establish prejudice under the second prong. *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069. Defendant here fails to establish the requisite prejudice.

In *Batson*, the United States Supreme Court established a three-step process for evaluating a claim that the State has exercised its peremptory challenges in a racially discriminatory manner. *Batson*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. First, the defendant must establish a *prima facie* case of purposeful discrimination in the selection of the jury. A *prima facie* showing of discrimination requires the defendant to demonstrate that relevant circumstances in the case raise an inference that the prosecutor exercised peremptory challenges to remove prospective jurors based upon their race. *Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1723; *People v. Williams*, 173 Ill. 2d 48, 71 (1996). Courts should consider the following circumstances in determining whether a defendant has established a *prima facie* case of discriminatory jury selection: (1) racial identity

between the defendant and the excluded venirepersons; (2) a pattern of strikes against black venirepersons; (3) a disproportionate use of peremptory challenges against black venirepersons; (4) the level of black representation in the venire as compared to the jury; (5) the prosecutor's questions and statements during *voir dire* examination and while exercising peremptory challenges; (6) whether the excluded black venirepersons were a heterogeneous group sharing race as their only common characteristic; and (7) the race of the defendant, victim, and witnesses. *Williams*, 173 Ill. 2d at 71. A trial judge's determination of whether a defendant has demonstrated a *prima facie* case of discriminatory jury selection will not be over-turned unless it is against the manifest weight of the evidence. *Williams*, 173 Ill. 2d at 71; *People v. Hudson*, 157 Ill. 2d 401, 426 (1993).

Once the defendant establishes a *prima facie* case, the burden shifts to the State to articulate a race-neutral explanation for challenging the venirepersons in question. If the State provides a race-neutral explanation, the trial judge must consider this explanation and determine whether the defendant has established purposeful racial discrimination. *Batson*, 476 U.S. at 96-98, 90 L. Ed. 2d at 87-89, 106 S. Ct. at 1723-24. The trial judge's determination on the ultimate issue of discrimination will not be reversed unless it is clearly erroneous. *Hudson*, 157 Ill. 2d at 426.

Defendant argues that he established a *prima facie* case of discrimination in the selection of the jury, and that the State should be required to provide a race-neutral explanation for striking the venirepersons in question. Defendant argues that the State excluded five black venirepersons by peremptory challenges: Barbara Martin, Alice Robinson, James Robinson, John Watson, and William Brown. The record of the jury selection proceedings, however, does not conclusively establish the

race of these individuals. Even assuming, *arguendo*, that the State used peremptory challenges to exclude five black venirepersons, the record shows that trial counsel would not have been successful in raising his *Batson* claim. The transcript of the hearing on defendant's post-trial motion provides information regarding defendant's *Batson* argument. At this hearing, the trial judge stated his recollections of the jury selection proceedings:

> "My records show that the State exercised 13 challenges and the defense exercised 13 challenges. And as both counsel indicated, there were 2 African American women who were on the jury. I was cognizant of the *Batson* issue before the jury selection starts as I am in every case. I pay close attention to look to see if I can see the development of any pattern with regard to either gender or race discrimination. That's the first thing I would note just briefly looking at this. I recall that the first 5 challenges by the State were of white persons and it was not until the State exercised their 6 challenges [*sic*] that they moved to excuse Alice Robinson. There were situations where while male black jurors were in a position and female black jurors were in a position to be seated on the jury where defense counsel exercised peremptory challenges of those individuals and not the State. Specifically, John Watson, William Brown. They were two male black jurors dismissed upon the challenge of the defendant. There is also a female black who is also Miss Donetta Isley who was excused as a result of the defendant's motion. I watched this jury selection process very carefully, kept notes of the whole matter and I did not see the development of any pattern on either side with regard to any racial motive to exclude jurors. And I did not see any challenges therefore with regard to the Batson matter as raised by counsel. The Court finds that first there is no prima facie case of any such development or conclusions that counsel was not effective in raising that issue because the issue wasn't an issue."

The record reveals that, contrary to the trial court's recollections, the prosecution, and not defendant, challenged John Watson and William Brown. Nevertheless, the trial court's finding that defendant failed to establish

a *prima facie* case under *Batson* is not against the manifest weight of the evidence. Defendant's argument rests solely on the basis that the prosecution used peremptory challenges to exclude five black venirepersons. The mere number of black venirepersons peremptorily challenged, without more, will not establish a *prima facie* case of discrimination. See *People v. Garrett*, 139 Ill. 2d 189, 203 (1990).

Because defendant has not provided any other information to support his claim of discriminatory jury selection, he has failed to establish a *prima facie* case of discrimination in the jury selection. Consequently, even if trial counsel had made a *Batson* argument during jury selection, the outcome of defendant's trial would not have been different. Defendant has therefore failed to establish the requisite prejudice for his ineffective assistance of counsel claim. For this reason, we reject defendant's claim that his trial counsel was ineffective for failing to preserve a *Batson* argument.

Defendant also raises a related argument, *i.e.*, that his trial counsel was ineffective for exercising a peremptory challenge to exclude venireperson Dahnetta Ousley, a black woman. Trial counsel exercised this peremptory challenge after the trial court denied the defense's challenge of Ousley for cause on the basis that she had previously served on a Cook County grand jury. Defendant now argues that he "specifically and expressly" disagreed with trial counsel's decision to excuse Ousley.

Nothing in the record supports defendant's position that he disagreed with trial counsel's decision to excuse Ousley. Regardless, this court has emphasized that the strategic decisions of trial counsel are generally protected by a strong presumption that the attorney's decisions reflect sound trial strategy rather than incompetence. *People v. Wiley*, 165 Ill. 2d 259, 289 (1995); *People v. Steidl*, 142 Ill. 2d 204, 240 (1991). Here, even if defen-

dant had disagreed with trial counsel's decision in this regard, we find that the decision to exclude a certain venireperson is a matter of trial strategy. Hence, this ineffective assistance of counsel claim fails.

## II. Evidence of Other Crimes

Defendant next argues that the admission of other-crimes evidence deprived him of his due process right to a fair trial. At defendant's trial, TQ testified regarding several violent episodes between defendant and Natalie. One such incident occurred on June 28, 1992. On that date, Natalie filed a police report because all of her clothes had been stolen from her apartment. Defendant later came to the apartment and asked to visit Natalie. When Natalie refused, defendant said, "I'll give you your clothes back." Natalie let defendant enter the apartment. Defendant then tried to give Natalie the keys to his apartment. When Natalie refused to accept the keys, defendant repeatedly hit Natalie and ripped her phone out of the wall. Defendant eventually left the apartment. Natalie suffered a swollen face from this attack.

TQ testified that another episode occurred on July 7, 1992, when TQ, Natalie, Kenneth, and Zita were together in a rental car. Defendant, while driving in his truck, rammed into the back of the car. Defendant pulled back and rammed the car a second time. When defendant pulled his truck back a third time, the victims drove away and went to the police station to file a report.

According to TQ, a third episode occurred on July 18, 1992. Natalie and TQ went to a hair appointment, and Kenneth picked them up when they were finished. As Natalie and TQ were leaving, defendant drove up and asked Natalie if he could talk to Kenneth. Natalie responded that she did not care. TQ saw defendant and Kenneth talking. TQ, Natalie, and Kenneth then entered Kenneth's car. Defendant got into his truck and rammed it into Kenneth's car. When Kenneth exited the car to as-

sess the damage, defendant pulled to the side of the car and fired a gun from his truck toward Kenneth's car multiple times. Kenneth took cover under nearby bushes. Defendant drove away but continued to shoot as he did so. The police were called to the scene, and a report was filed.

Defendant argues that this admission of other-crimes evidence, and the prosecution's reference to these crimes during opening and closing arguments, deprived defendant of his due process right to a fair trial. According to defendant, this evidence was not relevant for any proper purpose, and any possible probative value of this evidence was outweighed by its prejudicial effect. We disagree.

Evidence of a crime for which a defendant is not on trial is not admissible if relevant merely to establish the defendant's propensity to commit crime. *People v. Placek*, 184 Ill. 2d 370, 385 (1998). Other-crimes evidence is admissible, however, when it is relevant for any purpose other than to show the defendant's propensity to commit a crime. *People v. Illgen*, 145 Ill. 2d 353, 365 (1991). For instance, other-crimes evidence is admissible to prove motive or intent. *Illgen*, 145 Ill. 2d at 364-65. Where other-crimes evidence is relevant for a permissible purpose, the trial court must still weigh the prejudicial effect of admitting the other-crimes evidence against its probative value. *Placek*, 184 Ill. 2d at 385. The admissibility of other-crimes evidence rests within the sound discretion of the trial court. *Placek*, 184 Ill. 2d at 385; *People v. Robinson*, 167 Ill. 2d 53, 63 (1995). As such, the trial court's decision will not be overturned absent a clear abuse of discretion. *Placek*, 184 Ill. 2d at 385; *Robinson*, 167 Ill. 2d at 63.

Here, the trial court did not abuse its discretion in admitting evidence of defendant's prior crimes as evidence of his motive and intent to harm Natalie and Ken-

neth. This case is analogous to *People v. Manzella*, 56 Ill. 2d 187 (1973), *overruled in part on other grounds*, *People v. Huckstead*, 91 Ill. 2d 536, 548 (1982). In *Manzella*, the defendant shot and stabbed his ex-wife Candace and murdered Candace's two sisters. The defendant testified and denied any involvement in the crimes. Candace testified at trial that, following her divorce from the defendant, a series of events occurred in which the defendant had harassed her by following her, physically abusing her, and attempting to frighten her. Candace also testified that, approximately five months before the murders, the defendant entered her home with a gun in the middle of the night and held her and her family hostage for two hours. One month prior to the murders, Candace and the defendant argued at a lounge, at which time defendant hit Candace and knocked her to the ground. *Manzella*, 56 Ill. 2d at 192-93. The court in *Manzella* held that the other-crimes evidence was admissible "to throw light on the intention of the defendant." *Manzella*, 56 Ill. 2d at 196. Proof of the defendant's various acts in the months prior to the crimes at issue was relevant to the defendant's malice, motive, and criminal intent. *Manzella*, 56 Ill. 2d at 197.

Similarly, in this case, the other-crimes evidence was admissible to prove defendant's motive and intent to commit the murders. The other-crimes evidence revealed defendant's continuing hostility and animosity toward Natalie and Kenneth. The clothes-stealing incident served as evidence that defendant's motive for the murders was his anger over the break-up of his relationship with Natalie. It also showed defendant's intent to harm Natalie. Likewise, all three crimes served as evidence of defendant's intent to harm both Natalie and Kenneth.

Defendant nevertheless argues that motive and intent were not at issue in this case. Specifically, defen-

dant argues, "[W]hoever committed these homicides clearly intended to kill the victims, so intent was not genuinely in issue. Likewise, the motive of the assailant was eminently clear." Defendant further contends that because he denied involvement in the murders, the identity of the perpetrator, not the motive and intent of the perpetrator, was the issue in this case. This argument is not persuasive. Although the evidence readily demonstrated that the shooter intended to kill the victims, the prosecution had to prove that defendant was the shooter. The prosecution introduced the other-crimes evidence to prove *defendant's* motive and intent to kill the victims, thus providing further proof of defendant's identity as the shooter.

Defendant argues that, even if the trial court properly admitted the other-crimes evidence, he was denied his due process right to a fair trial because the trial court failed to give the jury a limiting instruction at the time the evidence was admitted. Defendant further argues that the instruction that the trial court did ultimately give the jury after closing arguments was an improper instruction. The State counters that defendant has waived these arguments by failing to ask the trial court to give the jury an instruction prior to admission of the other-crimes evidence, and by failing to object at trial to the instruction ultimately given. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Waiver, however, limits the parties' ability to raise an argument, not this court's right to entertain an argument. See *People v. Kliner*, 185 Ill. 2d 81, 127 (1998). For this reason, we address the merits of defendants' arguments.

Defendant argues that a proper limiting instruction *must* accompany the admission of other-crimes evidence in order to ensure that the jury at no time uses the evidence for the improper purpose of forming a negative opinion of the defendant. We do not agree. The better

practice may be for trial courts to instruct the jury, not only at the close of the case, but also at the time other-crimes evidence is admitted, of the limited purpose for which it may consider the other-crimes evidence. See *People v. Denny*, 241 Ill. App. 3d 345, 360-61 (1993); Illinois Pattern Jury Instructions, Criminal, No. 3.14, Committee Note (3d ed. Supp. 1996). The trial court's failure to do so, however, does not mandate reversal. Here, the trial court properly instructed the jury after closing arguments, in accordance with Illinois Pattern Instruction for criminal cases No. 3.14, as follows:

"Evidence has been received that the defendant has been involved in offenses other than those charged in the indictment. This evidence has been received on the issues of the defendant's intent and motive and may be considered by you only for that limited purpose. It is for you to determine whether the defendant was involved in those offenses and, if so, what weight should be given to this evidence on the issues of intent and motive."

This instruction informed the jury of the limited purpose for which it could consider the other-crimes evidence. Defendant's argument that this jury instruction was erroneous rests upon defendant's contention that motive and intent were not at issue in this case. As we have already discussed, the other-crimes evidence was admissible to establish defendant's motive and intent to harm the victims. In sum, defendant was not denied a fair trial by the admission of other-crimes evidence.

## III. Disclosure of Prior-Threat Evidence

Defendant next argues that the State presented at trial evidence of a prior threat made by defendant without disclosing this information to the defense. Mary Pearson, the common law wife of defendant's second cousin as well as the sister-in-law of Natalie, testified regarding a conversation that she had with defendant on July 17, 1992, the day before the car ramming and shooting incident, and approximately four months before the

murders. During the conversation, defendant brought up Natalie's name. Defendant told Mary that he loved Natalie and that he had "made" Natalie what she was. Defendant also stated that he had "invested too much money on Natalie." Defendant then told Mary: "All I can say is that nobody is going to have Natalie because Natalie is mine, I made Natalie what she is today and if I have to, I'll kill Natalie and Kenneth." In referencing Mary's testimony during closing argument, the prosecutor stated, "Prophetic words. folks. He did exactly what he told Mary Pearson he was going to do and he did it."

Defendant argues that the State's presentation of this evidence violated Supreme Court Rule 412(a)(ii) (134 Ill. 2d R. 412(a)(ii)) and the due process guarantees underlying this rule. Rule 412(a)(ii) requires the State to disclose upon written motion of defense counsel "any written or recorded statements and the substance of any oral statements made by the accused ***, and a list of witnesses to the making and acknowledgment of such statements." 134 Ill. 2d R. 412(a)(ii). The rule encompasses not only statements to the police but also statements to private citizens. See *People v. Weaver*, 92 Ill. 2d 545, 558 (1982).

Defendant points out that, during argument on the defense motion *in limine* to exclude evidence of other crimes, the prosecutor stated that "any prior threats, any prior acts of aggression by the defendant on any of these victims are certainly probative, and counsel is well aware of them. They are elicited in all of the police reports, and we intend to show those offenses." Defendant argues that these statements of the prosecutor acknowledge the State's failure to tender the prior threat evidence to the defense. Defendant also argues that the threat about which Mary Pearson testified was not contained in any police report. Defendant concludes that the State's violation of Rule 412(a)(iii) requires reversal of his convictions. We disagree.

We first note the State's argument that defendant has waived this contention by failing to object to Mary Pearson's testimony regarding the prior threat evidence and by failing to object to the prosecution's reference during closing argument to the prior threat evidence. See *People v. Enoch*, 122 Ill. 2d·176, 186 (1988). Waiver, however, is not a limitation on this court's right to entertain an argument. See *People v. Kliner*, 185 Ill. 2d 81, 127 (1998). For this reason, we address the merits of defendant's argument.

We are not able to discern from the record whether the threat at issue is contained in a police report. Nonetheless, the purpose of the discovery rules is to protect the accused against surprise, unfairness, and inadequate preparation. *People v. Robinson*, 157 Ill. 2d 68, 79 (1993); *People v. Cisewski*, 118 Ill. 2d 163, 172 (1987). Although compliance with the discovery rules is mandatory, the failure to comply with these rules does not require reversal absent a showing of prejudice. *Robinson*, 157 Ill. 2d at 78; *Cisewski*, 118 Ill. 2d at 172. The burden of showing surprise or prejudice rests on the defendant. *Robinson*, 157 Ill. 2d at 78. The defendant's failure to request a continuance upon learning of a discovery violation is a relevant factor to consider in determining whether the new evidence prejudiced the defendant. *Robinson*, 157 Ill. 2d at 78; see also *Cisewski*, 118 Ill. 2d at 174-75.

Here, defendant has failed to meet his burden of showing that he was surprised or prejudiced by the introduction of Mary Pearson's testimony. Throughout the proceedings, defense counsel never indicated that he was unaware of this threat evidence. At the hearing on defendant's motion *in limine* to exclude evidence of other crimes, the prosecution stated:

"Judge, there will be a lot of evidence that there was a prior relationship between the defendant and one of the victims, that being Natalie Wilson. After that relationship ended, there was a series of incidents, violence, threats. He

in fact, threatened them to other people who we intend to call as witnesses. In fact, one of the family members, he indicated a threat to the victims on the day of or just before this shooting on July the 18th, and counsel is aware of that as well."

Defense counsel did not object after the prosecutor made this statement. The prosecutor could only have been referring to Mary Pearson's above-referenced conversation with defendant. This conversation occurred on July 17, 1992; Mary is a family member; and defendant threatened the victims in this conversation. Further, when Mary testified regarding the prior-threat evidence, defense counsel did not ask for a continuance and did not suggest in any way that this testimony was a surprise. Indeed, nothing in the record indicates that the defense was either surprised or prejudiced by this prior-threat evidence. We, therefore, reject defendant's argument that the alleged discovery violation requires reversal of his convictions.

### IV. Hearsay Evidence

Defendant challenges the admission of certain testimony as inadmissible hearsay. Defendant argues that the admission of this evidence violated his rights to due process and confrontation under the sixth and fourteenth amendments to the United States Constitution, and article I, section 8, of the Illinois Constitution of 1970.

### A. Testimony of Alfreida Seals

Alfreida Seals, the mother of the victim Kenneth, testified that, beginning in May 1992, defendant began to call the Seals' home and would ask to speak with Kenneth or Natalie. At first, defendant called once a day but the frequency of the calls eventually escalated to two or three times a day. According to Mrs. Seals, Kenneth bought a gun after these calls started.

Mrs. Seals also described an occurrence at her home in late July 1992. Defendant came to the Seals' residence

on a Sunday morning. Both Natalie and Kenneth had spent the night at the Seals' residence. When Mrs. Seals answered the door, defendant asked to speak to Natalie. Natalie did not want to talk to defendant, but Mrs. Seals told her to go outside and talk to him. Mrs. Seals, Kenneth, and Kenneth's sister left the house to drive to church; defendant and Natalie were standing on the driveway. Mrs. Seals told Natalie that it was time to go. Natalie responded that defendant "won't let me go." Mrs. Seals replied, "Yes, he's going to let you go. Come on and get into the car." At this point, Natalie entered the car, and defendant left.

Mrs. Seals further testified that defendant called her home a few days before the murders and asked to speak with Kenneth. Kenneth accepted the call. Mrs. Seals heard arguing and heard Kenneth tell defendant, "I did something you couldn't do. Natalie is pregnant with my baby."

Defendant contends that the admission of Mrs. Seals' testimony was an "unconstitutional use of hearsay evidence." Defendant has waived his challenge to the admission of the testimony regarding Kenneth's purchase of a gun by failing to object to it at trial. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Defendant argues, however, that trial counsel was ineffective for failing to object to this testimony. Defendant has failed to establish that counsel's performance was deficient. See *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

Mrs. Seals' testimony regarding Kenneth's purchase of a gun did not contain hearsay. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. *People v. Albanese*, 102 Ill. 2d 54, 70 (1984). The fact that Kenneth bought a gun is not hearsay because it was not a statement. Mrs. Seals merely testified as to what *she* knew—that Kenneth bought a gun. In this regard, Mrs. Seals did not testify as to any out-of-court statements made by Kenneth.

With regard to the admission of the "he won't let me go" testimony, defendant has waived his challenge to this evidence by failing to object to it at trial. See *Enoch*, 122 Ill. 2d at 186. Defendant argues that trial counsel was ineffective for failing to object to this testimony. We find that this issue involves a matter of trial strategy and therefore will not support a claim of ineffective assistance of counsel. See *People v. Wiley*, 165 Ill. 2d 259, 289 (1995). Trial counsel may have chosen not to object to this testimony because it was not damaging to defendant's case. Defendant was merely talking to Natalie, and when Mrs. Seals told him to let Natalie go, defendant did so.

Finally, as to the testimony regarding Kenneth's statement to defendant about Natalie's pregnancy, the trial court properly admitted this evidence. Trial counsel objected to this testimony at trial. At a sidebar, the trial court determined that this statement was not hearsay because it was not offered to prove the truth of the matter asserted. Rather, this statement was offered to prove what defendant had been told. If an out-of-court statement is offered for some purpose other than to establish the truth of the matter asserted, the statement is not hearsay and is thus admissible. *Albanese*, 102 Ill. 2d at 70. Here, the statement was not offered to prove that Natalie was pregnant with Kenneth's child. The statement was relevant to show defendant's motive for the shooting—jealousy over Natalie's relationship with Kenneth.

In a related argument, defendant contends that trial counsel was ineffective for failing to request the trial court to instruct the jury of the limited purpose for which it could consider this evidence. Defendant has failed to show that there is a reasonable probability that the outcome of his trial would have been different had trial counsel requested such a limiting instruction. See *Strick-*

*land,* 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. Defendant's claim of ineffective assistance of counsel in this regard therefore fails.

### B. *Testimony of Police Officer Regarding July 18, 1992, Episode*

Defendant also challenges the admission of testimony by Chicago Police Officer John Maples. As previously discussed, on July 18, 1992, defendant, while driving his truck, rammed into Kenneth's car, in which Natalie and TQ were passengers. When Kenneth stepped out of the car to assess the damage, defendant pulled to the side of the car and fired a gun from his truck toward Kenneth's car multiple times. Officer Maples was one of the officers who arrived at the scene. Officer Maples testified about information that he learned from Natalie and Kenneth during his investigation:

"Q. Officer, after talking to Natalie Wilson and Kenneth Seals, did you go looking for anybody?

A. Yes. We were provided with a license plate of a vehicle, and Natalie Wilson also related that Delbert Heard was the owner and driver of the vehicle.

Q. And Officer, after she provided you with the name of Delbert Heard, did you go looking for Delbert Heard?

A. Yes, we did.

\*\*\*

Q. Do you recall the license plate number of that vehicle?

A. Yes, I do.

Q. What is that?

A. YMU 711.

Q. After you received that license plate number, did you do anything yourself?

A. Yes, It was run again via COs and came back multi-owners, and one of the owners being Delbert Heard."

Defendant argues that Officer Maples' testimony presented inadmissible hearsay regarding defendant's involvement in the car ramming and shooting incident. Defendant has waived this issue by failing to object at

trial to Officer Maples' testimony. See *Enoch*, 122 Ill. 2d at 186. Defendant argues, however, that trial counsel was ineffective for failing to object to Officer Maples' testimony. We find that defendant has failed to show that there is a reasonable probability that the outcome of his trial would have been different had trial counsel objected to this testimony. See *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. Officer Maples' testimony was, at most, merely cumulative of TQ's testimony regarding the events of this car ramming and shooting incident.

### C. Testimony of TQ Regarding Conversations Between Defendant and Natalie

Defendant next challenges, on hearsay grounds, the admission of TQ's testimony regarding conversations between defendant and Natalie. First, defendant argues that the trial court erred in admitting TQ's testimony regarding defendant's having stolen Natalie's clothes in June 1992. On direct examination, TQ related that defendant later came to the apartment and asked Natalie to let him in. When Natalie refused, defendant said, "I'm not going to do anything to you." When Natalie refused again, defendant said, "I'll give you your clothes back." Natalie relented. Defendant then tried to give Natalie the keys to his apartment. Natalie told defendant that she did not want the keys.

TQ also testified about a conversation between defendant and Natalie on the night of the murders. TQ stated that, on that night, defendant had earlier come to Natalie's apartment. Defendant asked Natalie to let him in. When Natalie refused, defendant said, "I'm not going to hurt you."

Defendant argues that this testimony regarding conversations between defendant and Natalie was inadmissible hearsay. According to defendant, these conversations were prejudicial because they "portrayed

him in a negative light." Defendant has waived this issue by failing to object at trial to TQ's testimony. See *Enoch*, 122 Ill. 2d at 186. Defendant argues, however, that trial counsel was ineffective in failing to object to this testimony. We find that defendant has failed to establish the requisite prejudice under *Strickland*. See *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. There is no reasonable probability that the outcome of defendant's trial would have been different had trial counsel objected to this testimony, particularly in light of the fact that a substantial amount of other properly admitted evidence in this trial portrayed defendant in a much more negative light.

V. Defense Rehabilitation of Alibi Witnesses

Defendant argues that the trial court improperly limited the defense's rehabilitation of two alibi witnesses whom the prosecution impeached on cross-examination. Defendant argues that this limitation denied him his due process right to a fair trial.

As previously discussed, two witnesses, Alonzo Williams and Tina Coleman, testified that they were with defendant continuously on the night of the murders. On cross-examination, the prosecution impeached these witnesses with the fact that they had not told police, prosecutors, the FBI, or the press of their alibi evidence. In response, both Alonzo and Tina stated that they had told defendant's attorney the information. On redirect examination of Alonzo, Alonzo stated that he had told defendant's attorney this information shortly after the murders. On redirect examination of Tina, trial counsel asked Tina when she first revealed to someone that she had been with defendant on the night of the murders. At this point, the prosecution objected. During a sidebar, the parties discussed with the trial judge whether it would be proper for defense counsel to elicit prior consistent statements from Tina and Alonzo that they had told

trial counsel, near the time of the crimes, that they had been with defendant on the night of the crimes. The trial court ruled that the prior consistent statements were inadmissible.

Defendant argues that the trial court should have allowed trial counsel to elicit not only that the witnesses had told trial counsel of the alibi evidence near the time of the murders, but also that trial counsel had advised the witnesses not to tell the authorities. We disagree.

The general rule is that a witness may not be rehabilitated by admitting former statements consistent with his trial testimony. *People v. Harris*, 123 Ill. 2d 113, 139 (1988). An exception to this rule exists where there is a charge that the witness recently fabricated the testimony or that the witness has a motive to testify falsely. *Harris*, 123 Ill. 2d at 139. Under these circumstances, a prior consistent statement may be admissible, but only if the witness makes the prior consistent statement before the motive to fabricate arose. *Harris*, 123 Ill. 2d at 139.

Here, Tina's and Alonzo's motive to fabricate the alibi testimony, *i.e.*, their relationship with defendant, existed at the time of defendant's trial, just as it did at the time of the murders. Thus, Alonzo and Tina did not make their alleged prior consistent statements before the motive to fabricate arose. Accordingly, the prior consistent statements were not admissible.

Defendant nevertheless argues that trial counsel was ineffective for failing to withdraw from representing defendant in order to be a witness in defendant's trial. According to defendant, trial counsel could have testified that he advised Alonzo and Tina not to talk to anyone about the case. Defendant has offered no relevant authority for his proposition that trial counsel had a duty to withdraw from representation.

Defendant appears to argue, however, that trial

counsel was also ineffective because of the improper underlying behavior of advising Alonzo and Tina not to tell anyone about the alibi evidence. Regardless of the propriety of this underlying behavior, defendant has cited no authority for his proposition that trial counsel's conduct requires a reversal of defendant's conviction. Defendant has failed to establish that there is a reasonable probability that, but for counsel's alleged deficient performance, the outcome of the trial would have been different. See *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. We therefore reject defendant's argument in this regard.

VI. Alleged Prosecutorial Misconduct

Defendant references three instances of alleged prosecutorial misconduct during trial. According to defendant, this misconduct denied him a fair trial.

*A. Evidence Regarding Search for Defendant on the Night of the Murders*

The prosecution presented evidence and argument that the authorities looked for defendant on the night of the murders but did not find him. Chicago Police Detective James Brennan testified on direct examination regarding his processing of the crime scene. After speaking with family members of the victims, Detective Brennan, along with TQ, Mary Pearson, and two other detectives, went in one car to look for defendant. Detective Brennan testified that they could not locate defendant that night.

Defendant argues that Detective Brennan's testimony was improper and prejudicial because the record shows that defendant voluntarily surrendered himself the day after the murders. Defendant has waived this argument by failing to object to the testimony at trial. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Defendant, however, argues that trial counsel was ineffective for failing to

preserve this issue. We find that defendant has failed to establish the requisite prejudice for his claim. See *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

The defense cites *People v. Hayes*, 139 Ill. 2d 89 (1990), in support of its argument that a defendant's concealment of himself from police is not relevant unless the defendant knew at the time of concealment that he was a suspect. The defense points out that the record reveals no evidence that defendant knew that police were looking for him before the time at which he surrendered himself.

Defendant's reliance upon *Hayes* is misplaced. In *Hayes*, testimony revealed that the police tried for over two weeks to apprehend the defendant and were not able to do so. The trial court concluded that this evidence was relevant because it raised an inference that the defendant concealed himself from the police. The *Hayes* court did not agree with the trial court's conclusion in this regard. Nevertheless, the *Hayes* court held that the trial court did not abuse its discretion by admitting the testimony as relevant to describe the circumstances leading up to the defendant's arrest, where these circumstances are important to a full explanation of the State's case. *Hayes*, 139 Ill. 2d at 130-32.

Here, Detective Brennan's testimony regarding the search for defendant at different locations on the night of the murders was relevant to establish TQ's reaction of ducking in the backseat when arriving at the various locations. The prosecution's theory was that TQ's delay in identifying defendant was attributable to her fear of defendant. There is no indication in the record that the prosecution improperly used this evidence to raise an inference that defendant concealed himself from the police.

*B. Comment on Defendant's Appearance at Trial*

The prosecutor stated in closing argument that "this

man [defendant], this mass murderer who sits before you today looking you right in the eye ***.'' Defendant argues that this was an improper comment on defendant's appearance in violation of his right not to be convicted except upon evidence admitted at trial, and in violation of his privilege against self-incrimination as guaranteed by the fifth amendment to the United States Constitution and by article I, section 10, of the Illinois Constitution of 1970. Defendant has waived this argument by failing to object to the statement at trial. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Defendant, however, argues that trial counsel was ineffective for failing to preserve this issue. We find that defendant has failed to establish the requisite prejudice for his claim. See *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

Defendant points out that a prosecutor may not comment on the defendant's appearance and behavior off the witness stand. Defendant cites *United States v. Schuler*, 813 F.2d 978 (9th Cir. 1987), *United States v. Pearson*, 746 F.2d 787 (11th Cir. 1984), and *United States v. Wright*, 489 F.2d 1181 (D.C. Cir. 1973). In *Schuler*, the prosecutor commented on the defendant's laughter in the courtroom during testimony about the racial and sexual remarks the defendant had made to authorities while being interrogated. *Schuler*, 813 F.2d at 979. In *Pearson*, the prosecutor commented on the defendant's nervousness at trial. *Pearson*, 746 F.2d at 796. In *Wright*, the prosecutor told the jury that it could consider during its deliberations the defendant's courtroom demeanor and behavior. *Wright*, 489 F.2d at 1185-86.

The test used in determining whether a prosecutor's comment constituted harmless error is whether the jury would have reached a contrary verdict had the improper remarks not been made. See *People v. Cisewski*, 118 Ill. 2d 163, 175 (1987). A comparison of the comment at is-

sue here to the comments at issue in the cases to which defendant cites demonstrates that the prosecutor's remark in this case does not rise to such a level that we could say that the jury would have reached a contrary verdict had the remark not been made. Defendant has, in turn, failed to establish that had trial counsel objected to this comment, there is a reasonable probability that the outcome of his trial would have been different. See *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

## C. Evidence Regarding the Familial Relationships and Character of the Victims

Defendant argues that the prosecutor improperly referred to and elicited testimony regarding the "familial relationships, personal traits, and peaceful character" of the victims. In its opening statement, for example, the prosecutor stated: "[A]t the time in November of 1992 at the time of her [Natalie's] death, you will hear about the relationship with her and Kenneth Seals. They were expecting a child. Natalie was approximately six to eight weeks pregnant at the time of her death."

Defendant also points out that, during the direct examination of Kenneth Seals' mother, Alfreida Seals, the prosecutor improperly elicited further "reference[s] to the victim's family," including that Mrs. Seals is a widow and attends church; that Kenneth was 23 years old when he was murdered; that Kenneth had lived at home with Mrs. Seals; that Mrs. Seals now has only one child, a daughter; and that Mrs. Seals knew that Natalie was pregnant. Mrs. Seals referenced Kenneth's "peaceable character" by testifying that Kenneth worked as a security guard and that he "was liked by everyone."

Defendant further argues that, during the direct examination of the medical examiner, the prosecutor again improperly elicited the fact that Natalie was pregnant. As a final matter, defendant argues that the prosecution

improperly elicited from Richard Custer, the boyfriend of victim Zita Jones, information regarding Zita's last activities before her death.

According to defendant, the foregoing information was not relevant and only served to prejudice defendant in the eyes of the jury. Defendant has waived this argument by failing to object at trial and by failing to raise the issue in his post-trial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). We decline to address the merits of this issue.

## VII. Prosecution's Failure to Correct Allegedly False Testimony

On cross-examination, TQ testified that, on the night of the murders, when the police officers came to investigate, the officers already knew about the July 18, 1992, car ramming and shooting incident. Specifically, TQ stated that "the police already knew about it," because "they had police reports on it." According to defendant, the testimony of Chicago Forensic Investigator John Butler and Chicago Police Detective James Brennan show that TQ's testimony was incorrect. Investigator Butler testified regarding his processing of the crime scene. Investigator Butler stated that he discovered the bodies of the victims, and that he later learned their identities. Detective Brennan likewise testified regarding his processing of the crime scene and about his questioning of TQ on the night of the murders. Detective Brennan stated that he learned of the July 18, 1992, incident at that time. Defendant argues that the testimony of the two officers contradicts TQ's testimony that the officers "already knew" of the July 18, 1992, incident. According to defendant, the prosecution's failure to correct TQ's false testimony violated defendant's due process right to a fair trial. Defendant's argument is without merit.

Neither the testimony of Investigator Butler nor the testimony of Detective Brennan supports defendant's

contention that TQ's testimony was false. The fact that Investigator Butler "later" learned the identity of the victims is not relevant. Nothing in Investigator Butler's testimony reveals that he had any contact with TQ. Thus, TQ's testimony has nothing to do with Investigator Butler's testimony. Further, Officer Brennan explained in his testimony that TQ told him about the July 18, 1992, episode during the initial investigation. The fact that Detective Brennan was not personally aware of the episode when he arrived at the crime scene on the night of the murders is of no consequence. The record reflects that the Chicago police responded to the scene of the July 18, 1992, episode, and that a police report was filled out when the police arrived at the scene. TQ's generalized statement during her testimony that "the police already knew" about this does not support defendant's argument that the prosecutor failed to correct false testimony. We therefore reject defendant's argument that he was denied a fair trial when the prosecution did not correct this testimony.

## VIII. Admissibility of Autopsy and Crime Scene Photographs

Defendant next argues that he was denied his due process right to a fair trial when the prosecution presented to the jury five "gruesome autopsy photographs." Defendant argues that the due process violation was compounded when 19 photographs of the crime scene, as well as an autopsy photograph of Natalie, were sent to the jury room for deliberations. Defendant states that these pictures depict "bodies and close-ups of body parts" and are "unnecessarily graphic." According to defendant, none of these "very prejudicial" photographs were relevant to the issue in dispute, i.e., whether defendant was the killer.

The decision of whether a jury should be allowed to see photographs of a decedent is a decision that rests

within the sound discretion of the trial judge. *People v. Henderson*, 142 Ill. 2d 258, 319 (1990). If photographs are relevant to prove facts at issue, they are admissible and may be shown to the jury unless the prejudicial nature of the photographs outweighs their probative value. *Henderson*, 142 Ill. 2d at 319. Among the valid reasons for admitting photographs of a decedent is to prove the nature and extent of injuries, the position and location of the body, the manner and cause of death, and to aid in understanding the testimony of a pathologist or other witness. *Henderson*, 142 Ill. 2d at 319-20. If photographs could aid the jury in understanding testimony, they may be admitted even if cumulative of that testimony. *Henderson*, 142 Ill. 2d at 320.

We first address defendant's argument that five autopsy photographs were improperly presented to the jury. These photographs depict the numerous gunshot wounds on each of the victims. Kenneth was shot 17 times, and Natalie and Zita were each shot five times. One of the photographs depicts Natalie's uterus being held open to show the six- to eight-week-old fetus she was carrying. During direct examination, the prosecutor showed these photographs to the assistant medical examiner who performed the autopsy on the victims. The medical examiner described what the photographs depicted and explained her findings as to each victim's injuries and cause of death. The medical examiner used the photographs extensively in describing the location of the gunshot wounds on the victims.

The trial court did not abuse its discretion in admitting the autopsy photographs. The trial judge considered these photographs and found them relevant to the manner of the victims' deaths, and that they related to the State's theory of the case in terms of the proposed motive. Moreover, the medical examiner properly used these photographs to explain the nature of the wounds suf-

fered by the victims. See *People v. Owens*, 65 Ill. 2d 83, 90 (1976). These photographs served the proper purpose of aiding the jury in its understanding of the medical examiner's testimony about the manner of the victims' deaths. Furthermore, these photographs were relevant to the State's theory of the case, *i.e.*, that defendant killed Natalie and Kenneth because of his anger over their relationship.

We next address defendant's argument that numerous photographs of the crime scene, as well as an autopsy photograph of Natalie, were improperly provided to the jury for deliberations. During direct examination, the prosecutor showed these photographs to both the assistant medical examiner and the forensic investigator. These witnesses used the crime scene photographs to explain the nature and extent of injuries, as well as the manner and cause of death. These photographs also served to aid the jury's understanding of the medical testimony.

The trial court did not abuse its discretion in admitting these photographs. The trial court properly determined that the probative value of these photographs was not outweighed by any prejudice. These photographs aided the State in proving the cause of death, the manner in which the crimes were committed, the nature and extent of the victims' injuries, and the position and location of the bodies. The record reveals that the trial judge carefully reviewed each photograph and considered the value of each picture. The judge explicitly sought to lessen the amount of prejudice to defendant and, at the same time, allow the State to prove the nature and manner in which these crimes were committed. The trial judge did not allow an autopsy photograph to be sent to the jury if the photograph was cumulative of the crime scene photographs. In fact, the trial judge allowed only one autopsy photograph to be sent back to the jury

because this photograph showed wounds on Natalie's legs, and these wounds were not adequately depicted in the crime scene photographs. We therefore find that the trial court did not abuse its discretion in admitting these photographs.

### IX. Defense Cross-Examination of TQ

Defendant argues that the trial court improperly limited the defense's cross-examination of TQ. Defendant contends that the trial court's limitation in this regard deprived him of his right to confrontation under the sixth amendment to the United States Constitution.

TQ testified that, on the night of the murders, the door between her room and Natalie's room was open, thereby enabling her to see defendant shoot Natalie and Kenneth. The defense challenged the credibility of this statement by TQ in its opening statement. Defense counsel stated: "[E]vidence will show the deceased, Mr. Seals and Natalie, are naked in bed. Now, I would assume that Natalie being a good parent is not going to have herself naked in bed with a man and leave the door open so Tanquinka [TQ] could be watching them in bed. The door would be closed."

During the direct examination of TQ, the prosecution established that the door between TQ's room and Natalie's room was left open because the two bedrooms shared one radiator. During defendant's cross-examination of TQ, the following colloquy took place:

"Q. Now it was your testimony, I believe, that the door is always open?

A. Right.

Q. Even when Kenneth and your mom were naked?

[PROSECUTOR:] Objection, Judge.

[COURT:] [S]ustained, assumes facts not in evidence."

Defendant argues that the trial court erred in ruling that the defense question assumed facts not in evidence. According to defendant, the record at this point already contained photographs of the crime scene which showed

Natalie and Kenneth naked in bed. Moreover, a forensic investigator who processed the crime scene had testified during the defense's cross-examination that Natalie was found partially naked. Therefore, defendant argues that the question did not assume facts not in evidence.

The latitude to be allowed on cross-examination is a matter within the sound discretion of the trial court, and a reviewing court should not interfere unless there has been a clear abuse of discretion resulting in manifest prejudice to the defendant. *People v. Collins*, 106 Ill. 2d 237, 269 (1985). We hold that the trial court did not abuse its discretion here. The photographs reveal that Natalie was naked from the waist down. The photographs do not reveal whether Kenneth was naked, as a sheet is covering his body. The forensic investigator testified that when he viewed the crime scene, Natalie was dressed in a nightgown without underwear, and Kenneth was wearing underwear. The trial court determined in its discretion that defense counsel's question assumed facts not in evidence. We find no reason to interfere with the trial court's ruling. We therefore reject defendant's argument that his constitutional right to confrontation was denied.

## X. Jury's Request for Transcripts During Deliberations

Defendant argues that he was denied his due process right to a fair trial when the trial court allowed the jury to continue to deliberate while certain trial transcripts that the jury had requested were being prepared. At noon, during the second day of deliberations, the jury sent a note to the trial court requesting to see "a transcript of the testimony given in the courtroom." Neither side objected to the trial court's response to the jury, which read: "Please be more specific as to which transcript, *i.e.*, for what witness or witnesses you would like to see." At 3:30 p.m., the jury sent the trial court another note requesting to see the transcript for the testimony of four witnesses: TQ; Tina Coleman; Alfreida

Seals; and Mary Pearson. The trial court, after speaking with the supervisor of the court reporters' office, informed the parties that the earliest time that the requested transcripts would be available was 10 a.m. the following morning. Defense counsel objected and suggested that the jury be told to rely upon its recollections. The prosecutor stated that he would agree to whatever the trial court determined to be the appropriate aid in helping the jury. The trial court ordered the production of the transcripts. Neither side objected to the trial court's note to the jury which read: "[T]he transcripts that you have requested are being prepared and I expect that they will be available by 10:00 a.m. tomorrow. In the meantime, continue to deliberate." At approximately 7 p.m., that same evening, before receiving the transcripts, the jury returned its verdicts.

Defendant now argues that he was denied his right to a fair trial when the trial court allowed the jury to continue to deliberate without first furnishing the requested transcripts. According to defendant, the trial court should have halted the deliberations pending availability of the transcripts. Defendant has waived this issue. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Defendant never requested that the trial court halt the deliberations pending the preparation of the transcripts. To the contrary, defendant suggested that the jury *not* be given the transcripts. Defendant cannot claim error in such a situation. See *People v. Schmitt*, 131 Ill. 2d 128, 137 (1989). Thus, defendant may not now claim that he was denied a fair trial because the jury did not receive the transcripts.

### XI. Ineffective Assistance of Trial Counsel

In addition to his numerous allegations of ineffective assistance of counsel already addressed, defendant raises other claims of ineffective assistance. Specifically, defendant argues that his trial counsel was ineffective for fail-

ing to impeach certain testimony: (1) failing to impeach the testimony of Monique DeYoung, Natalie's landlord, that she heard TQ say, "[W]hy did Heavy shoot my mama?" with a police report indicating that Mrs. DeYoung told the police that TQ said "someone shot her mother"; (2) failing to impeach Mary Pearson's testimony regarding defendant's prior threat to kill Natalie and Kenneth, with Mary's failure to tell the police of this threat shortly after the incident; (3) failing to impeach a police officer's testimony that there was no evidence of a robbery motive, with police reports and photographs revealing that the room had been ransacked; (4) failing to impeach a police officer's testimony that TQ was shaking and hard to question on the night of the murders, with a videotape of the questioning of TQ; (5) failing to impeach TQ's testimony regarding the July 18, 1992, car ramming and shooting incident that she did not tell the police that Natalie had told her the type of gun defendant used, with a police report that indicates that Natalie told her that the gun was an automatic; (6) failing to impeach TQ's testimony that she had not told the police what time Zita's boyfriend left the apartment on the night of the murders, with a police report contradicting this statement; (7) failing to impeach TQ's testimony that she had not told defendant that she was selling candy for a school fundraiser, with evidence that she had told defendant this information; and (8) failing to impeach TQ's testimony that there were only three sets of keys to the apartment, with a police report indicating that TQ said there were four sets of keys.

Defendant also argues that trial counsel was ineffective for (1) failing to request a jury instruction on weighing the credibility of an eyewitness; (2) making promises in opening argument that he would prove certain things and then failing to later prove them; (3) failing to obtain psychological reports on TQ where counsel knew that

she had been to a psychologist a few times; (4) tricking defendant into waiving his right to testify and then failing to present the agreed defense strategy; (5) failing to rebut the prosecution's theory that TQ did not identify defendant earlier because she was afraid of him; and (6) stating in closing argument that "[a]nything I say that is incorrect or the State wants to argue about they'll have a chance to do it in rebuttal."

We note that much of the evidence to which defendant refers is not in the record. Defendant's arguments in this regard are improper on direct appeal. See *People v. Woolley*, 178 Ill. 2d 175, 204 (1997). In any event, defendant fails to establish a reasonable probability that, but for these alleged instances of ineffective assistance of counsel, the outcome of defendant's trial would have been different. See *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. We therefore reject defendant's claims of ineffective assistance of counsel.

### XII. Sufficiency of the Evidence

Defendant argues that the evidence was insufficient to prove him guilty beyond a reasonable doubt. Defendant contends that the jury would not have found him guilty had the jury not heard the improper other-crimes evidence, improper prior-threat evidence, and improper hearsay evidence. Defendant points out that he presented two alibi witnesses who stated that they were with him continuously on the night of the murders. Defendant argues that the only proper evidence that the State set forth was the identification testimony of TQ, and that this testimony was insufficient to convict defendant beyond a reasonable doubt. As a preliminary matter, we note that we have rejected defendant's arguments regarding the improper admission of other-crimes evidence, prior-threat evidence, and hearsay evidence. We nevertheless address defendant's argument regarding TQ's identification of defendant as the shooter.

Defendant challenges the credibility of TQ's testimony. The principal witness for the State was TQ, who was 10 years old at the time of the murders. At trial, TQ identified defendant as the shooter. As discussed, TQ testified that she saw defendant in Natalie's room at the foot of Natalie's bed. When questioned by police on the night of the crimes, however, TQ claimed to have been asleep during the murders, and stated that she did not see the shooter. TQ told police 14 months after the murders that defendant was the shooter. She told the police this information while preparing to be a witness against defendant for the July 18, 1992, car ramming and shooting episode. At trial, TQ stated that she did not initially tell anyone that defendant was the shooter because she was afraid that defendant would kill her.

Defendant argues that TQ's testimony is so lacking in credibility that a reasonable doubt of defendant's guilt remains. We disagree. Credibility of witnesses, the weight to be given their testimony, and reasonable inferences to be drawn from the evidence, are responsibilities of the trier of fact. *People v. Steidl*, 142 Ill. 2d 204, 226 (1991). A reasonable inference from the facts of this case is that a 10-year-old child would be unresponsive to police after witnessing a murder. It is also reasonable that, as time passed, and the shock of the murders diminished, TQ would be able to recount the events from the night of the crimes, and then be able to identify defendant.

Furthermore, additional evidence supported TQ's identification of defendant as the shooter. When questioned by police on the night of the murders, TQ claimed to have been asleep during the murders. However, the landlady, to whom TQ had run for help, testified that she heard TQ say, "[W]hy did Heavy shoot my mama?" The police suspected defendant of the crime and therefore took TQ with them in a car while searching for defendant. Testimony revealed that when they passed defen-

dant's address, TQ crouched down in the car and said, "He gon see us."

When reviewing the sufficiency of the evidence in a criminal case, the relevant question is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). A review of the evidence in this case leads us to the conclusion that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

XIII. Propriety of Death Sentence

Defendant argues that, based on the aggravating and mitigating factors present in this case, the penalty of death is not an appropriate sentence. We point out that "each capital case is unique and must be evaluated on its own facts, focusing on whether the circumstances of the crime and the character of the defendant are such that the deterrent and retributive functions of the ultimate sanction will be served by imposing the death penalty." *People v. Johnson*, 128 Ill. 2d 253, 280 (1989). It is this court's responsibility in every death penalty case to consider the defendant's character and the circumstances surrounding the crime in order to determine the appropriateness of the sentence. After careful consideration, we conclude that the death penalty is the appropriate penalty in this case.

The evidence here showed that in early 1992, Natalie Wilson ended her relationship with defendant and established a relationship with Kenneth Seals. At this point, defendant began to terrorize Natalie and Kenneth. On two occasions, defendant rammed his car into the car of the victims. He then pulled out a gun and began to shoot at the victims. Defendant threatened to kill Natalie and Kenneth if they did not "leave each other alone." Defendant felt that Natalie was "his" because of

the money he had invested in her. Defendant claimed that he "made" Natalie what she was.

In a misguided attempt to get back into Natalie's life, defendant stole all of Natalie's clothes from her apartment. When defendant offered to return the clothes, Natalie let defendant into her apartment. Defendant battered Natalie in front of her daughter TQ. Defendant repeatedly called the victims and warned them to stay away from each other. Defendant harassed the victims at their homes.

Ultimately, defendant armed himself with enough ammunition to fire 32 rounds, entered Natalie's home and shot Natalie 5 times, and shot Kenneth 17 times. When Zita Jones screamed upon hearing the shots, defendant eliminated her with five shots. Defendant eliminated a family member from three separate families. By murdering Natalie, defendant left the 10-year-old TQ without a mother. Although defendant has no significant criminal history, his actions in this case reveal a person with an evil heart.

Defendant attempts to compare his case to other cases in which this court has vacated the death penalty where the defendant had no significant criminal history and acted in response to mental or emotional disturbances, namely, *People v. Leger*, 149 Ill. 2d 355 (1992), *People v. Johnson*, 128 Ill. 2d 253 (1989), *People v. Buggs*, 112 Ill. 2d 284 (1986), and *People v. Carlson*, 79 Ill. 2d 564 (1980). A review of these cases does not lead us to conclude that defendant's death sentence is excessive.

In *Carlson*, the defendant was convicted of the murders of his ex-wife and a police officer. The defendant and his wife, after 19 years of marriage, divorced three months prior to the murders. The defendant and his ex-wife had planned to remarry, but his ex-wife then told the defendant that she had a new boyfriend. Soon after learning of this news, defendant shot and killed his ex-

wife and set fire to her home. When the police later tried to arrest the defendant, he shot and killed one of the officers. The defendant testified that he was attempting to commit suicide when he accidentally shot the police officer. Testimony revealed that the defendant had been suffering from severe emotional and physical problems before the shootings. *Carlson*, 79 Ill. 2d at 570-75.

Next, in *Buggs*, the defendant was convicted of the murders of his wife and one of their children. The defendant and the wife were arguing about the wife's infidelity when the wife told the defendant that he was not the father of two of their sons. At that point, defendant poured gasoline on his wife and the stairs and lit a match. The defendant's wife and one of their children died in the fire. The defendant had a history of alcohol-related problems, including blackouts. A psychiatrist testified that the defendant suffered from an "Isolated Explosive Disorder" at the time of the offenses. *Buggs*, 112 Ill. 2d at 288-89, 295.

In *Johnson*, the defendant shot and killed one man and shot and wounded two others. The homicides occurred nine days after the defendant was fired from his job and returned to his place of employment for his final paycheck. When the defendant arrived, he was told that there was no paycheck for him. The defendant then shot the supervisor who had fired him, shot one of his former coworkers, and shot and stabbed a third victim. On the day of the offenses, the defendant had used alcohol, cocaine, and marijuana laced with the drug "PCP." *Johnson*, 128 Ill. 2d at 259-63.

Finally, in *Leger*, the defendant shot and killed his estranged wife five days before the finalization of their divorce. Later that same night, the defendant shot and killed his former wife and shot his former wife's new husband. Testimony revealed that the defendant had a history of drinking problems, including blackouts.

Testimony also revealed that, on the date of the offenses, the defendant was taking 10 different prescription drugs, including antianxiety medication, and medication containing codeine and librium. Experts testified that these medications could affect a person's ability to reason. *Leger*, 149 Ill. 2d at 365-66, 412.

These cases are distinguishable from the instant case. There is no evidence here that defendant suffered from any mental or emotional problems, or that defendant was under the influence of alcohol or drugs at the time of the murders. Defendant's relationship with Natalie had been over for months, and defendant was engaged to another woman at the time of the murders. The murders were the culmination of an escalating history of violence by defendant against the victims, not a spontaneous reaction to information such as the infidelity of a spouse.

The record reveals a cold-hearted murderer who stated that "nobody is going to have Natalie because Natalie is mine." Because defendant had "invested too much money on Natalie," he was unwilling to allow her to have a relationship with another man. For this reason, he murdered Natalie and Kenneth. When defendant heard Zita Jones screaming in the next room, he shot her five times. Zita was in bed. She was unarmed and no threat to defendant. Zita had nothing to do with the relationship between Natalie and Kenneth.

Defendant nonetheless contends that this case involves evidence of emotional disturbance. Defendant argues that a pattern of stalking and harassing the object of a person's obsession is indicative of a mental or emotional disturbance categorized by psychiatrists as "erotomania." Defendant cites to articles regarding "erotomania" in support of his argument. Defendant, however, offered no testimony that he suffers from this disturbance. In any event, we are not persuaded by the suggestion that murdering a person solely because that

person is the object of the killer's obsession is mitigation evidence.

XIV. Constitutionality of Death Penalty Statute

Defendant raises several challenges to the constitutionality of the Illinois death penalty statute. We have previously considered and rejected each of defendant's arguments. This court has rejected claims that the death penalty statute is unconstitutional because it: (1) affords prosecutors unbridled discretion in deciding whether to seek the death penalty (see, *e.g.*, *People v. Williams*, 147 Ill. 2d 173, 265 (1991)); (2) does not provide the defendant with pretrial notice that the prosecutor will seek the death penalty (see, *e.g.*, *People v. Evans*, 125 Ill. 2d 50, 99 (1988)); (3) impermissibly places the burden of proof and persuasion upon the defendant (see, *e.g.*, *People v. Thomas*, 137 Ill. 2d 500, 537-38 (1990)); (4) fails to provide for comparative proportionality review (see, *e.g.*, *People v. King*, 109 Ill. 2d 514, 551 (1986)); (5) fails to ensure that all aggravating factors relied upon by the sentencer are relevant and permissible (see, *e.g.*, *People v. Guest*, 115 Ill. 2d 72, 111-12 (1986)); (6) fails to provide a rational basis for differentiating the factors that distinguish when murder may justify the death penalty and when it may not (see, *e.g.*, *Williams*, 147 Ill. 2d at 267); (7) allows the death penalty to be sought and imposed in a discriminatory manner (see, *e.g.*, *People v. Thompkins*, 161 Ill. 2d 148 (1994)); (8) is used inconsistently by prosecutors (see, *e.g.*, *People v. Stewart*, 123 Ill. 2d 368, 378-81 (1988)); and (9) lists aggravating and mitigating factors that are unconstitutionally vague (see, *e.g.*, *Thompkins*, 161 Ill. 2d at 197-98). We find no reason to overturn our previous rejection of these arguments.

Defendant also argues that this court may grant "appropriate relief without even having to resort to federal law." In support of this argument, defendant cites cases where this court has interpreted provisions of our state

constitution to provide more protection to defendants than the counterpart provisions of the federal constitution. Defendant has failed to present this argument with any specificity. We are therefore unable to respond to this argument.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed. We direct the clerk of this court to enter an order setting Tuesday, November 9, 1999, as the date on which the sentence of death, entered by the circuit court of Cook County, shall be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119—5 (West 1996). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Tamms Correctional Center, and the warden of the institution where defendant is confined.

*Affirmed.*

JUSTICE HARRISON, concurring in part and dissenting in part:

I agree that Heard's convictions should not be disturbed, but would set aside his sentence of death. For the reasons set forth in my dissent in *People v. Bull*, 185 Ill. 2d 179 (1998), this state's present death penalty law does not meet the requirements of the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) or article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). Accordingly, we should vacate Heard's death sentence, and he should be sentenced to a term of imprisonment. 720 ILCS 5/9—1(j) (West 1992). Because Heard has been found guilty of murdering more than one victim, the term of his imprisonment must be natural life. 730 ILCS 5/5—8—1(a)(1)(c)(ii) (West 1992).