2015 IL App (1st) 133033
Nos. 1-13-3033 & 1-13-3107 (Consolidated)
September 1, 2015

SECOND DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | Of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 11 CR 5697 |
| | ) | |
| MARCUS WIGGINS and ANDRE SWIFT, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Thomas Arthur Hill, |
| | | Judge Presiding. |

JUSTICE NEVILLE delivered the judgment of the court, with opinion.
Justice Simon concurred in the judgment and opinion.
Justice Liu dissented, with opinion.

**OPINION**

¶ 1        A jury found Marcus Wiggins and Andre Swift, guilty of attempting to murder Robert Barnes by shooting him. Barnes admitted at trial that he signed a statement in which he identified Wiggins as the shooter and Swift as the person who ordered the shooting, but he testified that he lied when he signed that statement. On appeal, Wiggins and Swift argue that the trial judge acted as a prosecutor when the judge asked Barnes questions designed to impeach Barnes's testimony at trial. Wiggins argues that the judge's other actions further signaled to the jury the judge's preference for the prosecution. We find that the judge

abandoned his role as a neutral arbiter and his acts prejudiced the defense. Accordingly, we reverse the convictions and remand for new trials.

¶ 2                                    BACKGROUND

¶ 3        On March 18, 2011, Robert Barnes and Miguel Ruffin walked to the corner of 51st Street and Ada Street in Chicago. Some men started arguing with Barnes. A man shot Barnes four times in the leg. The shooter and the other men left the scene. Police arrived a few minutes later and an ambulance took Barnes to a hospital.

¶ 4        In the hospital, Barnes told police that members of the Blackstones gang shot him. Assistant State's Attorney Jennifer Hamelly (ASA Hamelly) wrote out, and Barnes signed, a statement about the shooting. Barnes checked himself out of the hospital later the same day. Based on Barnes's statement, police arrested Wiggins and Swift and charged them with attempted murder.

¶ 5        A single jury heard the evidence against both Wiggins and Swift. At the trial, Barnes testified that the shooting arose out of a disagreement about which gang controlled drug sales on the corner of 51st and Ada. Barnes, a member of the Latin Kings, said that on March 18, 2011, the day before the shooting, he went to the corner of 51st and Ada to sell drugs. Swift, of the Blackstones, drove up in a white van and told Barnes not to sell drugs on that corner, because Blackstones controlled that area.

¶ 6        Barnes testified that on March 19, 2011, he returned to the corner of 51st and Ada, this time coming to the corner with Ruffin, who was a former member of the Latin Kings. A white van passed them and stopped. Barnes testified that Al Clark and two other Blackstones got out of the van. A masked man shot Barnes and got into a green van, while the others left

2

the scene in the white van. Barnes testified that he did not see Swift at the scene of the shooting, and he did not know whether Swift held any rank in the Blackstones.

¶ 7 Barnes admitted at trial that the statement he signed told a different story. According to the statement, Barnes knew that Swift was a general in the Blackstones. Swift and Wiggins got out of the white van on March 19, 2011. After arguing with Barnes about the drug sales, Swift said to Wiggins, "handle this." Barnes told ASA Hamelly that Wiggins, who wore no mask, then shot him.

¶ 8 Barnes testified that he lied to police and to ASA Hamelly about the shooting. He knew some Blackstones shot at him, so he named some Blackstones as the persons responsible, even though he had not seen them at the scene. Barnes said that he later called Swift's attorney. He went to the attorney's office, where he signed a statement admitting that he lied to police.

¶ 9 The trial judge interrupted the assistant State's Attorney's questioning of Barnes to ask:

"This version of the events contained in the document that you signed as prepared by [Swift's attorney], did you ever reach out to the police and tell them about the facts contained in that document?"

Barnes admitted he did not so tell the police. The judge followed with the question: "Did you ever contact the Cook County State's Attorney's Office and tell them about the facts contained in that affidavit?"

¶ 10 Again, Barnes admitted he did not.

¶ 11        On recross examination, Swift's attorney asked Barnes a question about the statement Hamelly wrote out. This colloquy followed:

"[Prosecutor]: Objection, Your Honor.

THE COURT: Basis.

[Prosecutor]: Impeaching.

THE COURT: Well, the Court's question is is it within the scope of what we just did?"

¶ 12        The judge then sustained his own objection to the question as beyond the scope of redirect examination.

¶ 13        Ruffin's testimony at trial largely corroborated Barnes's trial testimony, and conflicted with the statement ASA Hamelly prepared for Barnes's signature. Ruffin testified that he saw two or three Blackstones get out of the white van, but he could not identify any of those gang members. Ruffin thought something bad would happen so he walked away quickly. He did not see the shooting. Some of the Blackstones got back in the white van, while others left in a car. Ruffin remembered that he spoke to police and ASA Hamelly after the shooting, but he did not remember what he said.

¶ 14        ASA Hamelly testified that Ruffin signed a statement she prepared. In the statement, Ruffin identified Swift as a general in the Blackstones and as the driver of the white van. Ruffin told ASA Hamelly he saw Swift, Wiggins, and another member of the Blackstones get out of the van. Swift told Barnes not to sell drugs in Blackstones territory. Barnes said Swift "can't tell [Latin Kings] what to do." Swift told Wiggins to "handle this." Wiggins took a

4

gun from his waistband. Ruffin started running before he heard the shots. Swift, Wiggins and the third Blackstone got in the white van and drove off.

¶ 15    Al Clark also testified at trial. He admitted that he was a member of the Blackstones, and he had two convictions for possession of controlled substances. He was still serving his prison sentence for those convictions at the time of trial.

¶ 16    Clark testified that on March 19, 2011, he drove a green car to 51st and Ada, where he saw Swift and Wiggins get out of the white van and walk up to Barnes. Swift argued with Barnes about drug sales on the block. Wiggins started shooting. The prosecutor asked, "And before the shooting began, did you hear [Swift] say anything to [Wiggins]?" Clark answered, "Not quite." Clark took off when the shooting started. Clark admitted that at the police station he signed a written statement which said he heard Swift say to Wiggins, "handle this."

¶ 17    On cross-examination, Swift's attorney showed Clark a copy of the written statement Clark signed at the police station. The prosecutor objected that the copy counsel used bore counsel's notes and other markings not on the original. The judge permitted defense counsel to use the copy, but the judge said, in the presence of the jury, "Well, okay, tell you what, watch yourself, man."

¶ 18    The prosecutor sought leave to have an assistant State's Attorney read to the jury the entirety of the written statement Clark signed at the police station. Both defendants objected. After listening to the parties' arguments, the court said:

        "The State has already taken the position, and I agree with it, that in this
    circumstance this witness when he testified, and I'll just use the one operative sort
    of fact and there may be other facts less operative, I'll say, regarding what, if

5

anything, *** Mr. Swift[] might have said. His testimony was 'not quite' or 'not exactly.' He has acknowledged that he gave a statement to the assistant state's attorney that was more definitive where he specifically *** told her that Swift said, 'Handle it.'

The Court is going to allow the assistant state's attorney who took that statement to talk about the entirety of it to put everything in context. There is an inconsistency here and the jury, I think, is entitled to hear everything that was said from the assistant state's attorney's standpoint to juxtapose that with the live testimony here about what Mr. Clark says he heard or didn't hear on the street."

¶ 19    According to the written statement, Clark drove to the corner of 51st and Ada, where he saw Swift pull up in a white van. Clark saw Swift and Wiggins approach Barnes. Swift argued with Barnes about who could sell drugs on that corner. Clark heard Swift say, "handle this," and then Wiggins started shooting.

¶ 20    Swift's attorney sought to establish, through cross-examination of the assistant State's Attorney, that police had not adequately investigated the shooting, as they made no effort to interview several eyewitnesses to the shooting. The judge interrupted the questioning to say: "Let me jump in here because *** the witness cannot speak for someone else. The whole series of questions about what the police could do and [the assistant State's Attorney] is not a police officer and so I'm going to sustain my own objection."

¶ 21    Wiggins cousin, Donnell Gardner, testified that on March 19, 2011, Wiggins spent the day with him.

6

¶ 22    In rebuttal argument, the prosecutor said to the jury that the defense attorneys were "selling you a bill of goods because that is their job." The trial court sustained counsel's prompt objection to the remark.

¶ 23    The jury found both Swift and Wiggins guilty of attempted murder, specifically finding that Wiggins personally discharged a firearm and caused great bodily harm to Barnes.

¶ 24    At the sentencing hearing, Wiggins presented extensive evidence of his considerable academic achievements. He received several awards for exceptional academic performance. Wiggins, who was 18 years old on March 19, 2011, had no prior convictions.

¶ 25    Swift's prior convictions start in 1996. He had two convictions for battery, followed by convictions for possession of controlled substances in 1998, aggravated vehicular hijacking in 2003, unlawful use of a weapon by a felon in 2005, and possession of a fraudulent identification card in 2008. He had only a brief period of lawful employment outside of prison.

¶ 26    The trial judge sentenced Wiggins to 50 years in prison and Swift to 45 years. The court denied their motions for new trial and for reconsideration of the sentences. Wiggins and Swift now appeal.

¶ 27                                ANALYSIS

¶ 28                             Wiggins' Appeal

¶ 29    Wiggins argues (1) the State failed to prove him guilty; (2) the trial judge should not have allowed into evidence the written statement Clark signed; (3) the judge acted as an advocate

for the State; (4) Wiggins' trial counsel provided ineffective assistance; and (5) the judge imposed an excessive sentence.

¶ 30                                     Sufficiency of the Evidence

¶ 31        We will not reverse a conviction for insufficient evidence as long as any rational trier of fact could find that the State proved all the elements of the charged offense beyond a reasonable doubt. *People v. Baskerville*, 2012 IL 111056, ¶ 31.

¶ 32        The State relied on three witnesses in support of the convictions. Barnes signed a statement which said Barnes heard Swift say, "handle this," and then Wiggins pulled out a gun and shot Barnes. At trial, Barnes renounced the written statement, testifying that the shooter wore a mask and Barnes did not see Swift at the scene. Ruffin signed a statement which said Ruffin saw Wiggins with a gun, and he heard Swift say, "handle this," before Ruffin heard shots. Ruffin, like Barnes, renounced the written statement at trial. Ruffin testified that he did not see who shot Barnes, and he could not identify Swift or Wiggins as the Blackstones he saw at the scene.

¶ 33        Only Clark testified to facts largely consistent with the facts in the written statement he signed. He testified, in accord with the written statement, that he heard Swift argue with Barnes, and he saw Wiggins pull out a gun and start to shoot. Clark testified that he did "[n]ot quite" hear Swift say anything to Wiggins before the shooting. In the written statement, Clark said he heard Swift say, "handle this."

¶ 34        The trial judge correctly found that the jury could use the prior inconsistent statements of Barnes and Ruffin as substantive evidence. See *People v. McCarter*, 385 Ill. App. 3d 919, 931 (2008); 725 ILCS 5/115-10.1 (West 2012). According to the written statements, Barnes

and Ruffin saw Wiggins pull out a gun right before they heard gunshots. Barnes said he saw Wiggins shooting. Clark testified that he saw Wiggins shoot Barnes. Despite the renunciation of the written statements, and Clark's motive, as a prisoner, to give the testimony the State sought, we find the evidence sufficient to support the conviction. See *People v. Graham*, 392 Ill. App. 3d 1001, 1009-10 (2009).

¶ 35                                   Clark's Written Statement

¶ 36        We review the ruling on the written statement Clark signed for abuse of discretion. *People v. Donegan*, 2012 IL App (1st) 102325, ¶ 52. Section 115-10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1 (West 2012)) governs the use of prior inconsistent statements as substantive evidence. Section 115-10.1 "required *** the trial court to determine whether the written statement *** was inconsistent with [the witness's] trial testimony and to admit only those portions which were actually inconsistent." *People v. Lawrence*, 268 Ill. App. 3d 327, 333 (1994). The trial judge here made no effort to follow the statutory strictures. The judge permitted the prosecution to read to the jury the entirety of the statement Clark signed, when that statement repeated his trial testimony in all significant respects but one. According to the signed statement, Clark heard Swift say, "handle this." At trial, Clark testified that he did "[n]ot quite" hear Swift speak right before Wiggins started shooting. The trial judge abused his discretion when he permitted the prosecutor to read to the jury the prior consistent statements in the written statement Clark signed.

¶ 37        The dissent argues that the trial court properly admitted Clark's prior consistent statement to rebut a charge that he recently fabricated his testimony. Neither the trial court nor the

9

prosecution advanced this theory to justify the use of Clark's statement. A brief review of the record shows why.

¶ 38    Clark testified at trial about the circumstances under which he signed the statement at the police station. Four days after the shooting, on March 23, 2011, Clark went to his girlfriend's home. Police climbed into the bedroom through a window late that night. They took Clark to the police station, where they kept him in a small windowless room for several hours. Clark knew he was not free to leave. When police questioned Clark, they told him a witness had already identified him in connection with the shooting. Clark then signed the statement identifying Wiggins as the shooter and stating that Swift told Wiggins to "handle this" problem.

¶ 39    The dissent correctly recites both the general principle that the court should not permit parties to introduce prior consistent statements from witnesses, and the narrow exception for prior statements used to rebut an inference that the witness recently fabricated the testimony or that the witness had a motive to testify falsely. Ill. R. Evid. 613(c) (eff. Jan. 6, 2015). "Under these circumstances, a prior consistent statement may be admissible, but only if the witness ma[de] the prior consistent statement before the motive to fabricate arose." *People v. Heard*, 187 Ill. 2d 36, 70 (1999).

¶ 40    Once police brought Clark to the police station for questioning and told him that a witness identified him in connection with the shooting, Clark had a motive to fabricate a story blaming someone else for the shooting. See *Heard*, 187 Ill. 2d at 70. Because Clark signed the statement after the motive to lie arose, the narrow exception the dissent cites does not apply. Ill. R. Evid. 613(c) (eff. Jan. 6, 2015); *People v. Terry*, 312 Ill. App. 3d 984, 995

10

(2000) (the prior consistent statements were not made until after the witness arguably had a motive to testify falsely-upon his questioning at the police station over a two day period, which may have meant he was a suspect). The State and the trial court cannot justify the introduction of the prior consistent statement into evidence under the exception for statements used to rebut an inference of recent fabrication or that the witness had a motive to testify falsely. See *Heard*, 187 Ill. 2d at 70; *Terry*, 312 Ill. App. 3d at 995; *People v. McWhite*, 399 Ill. App. 3d 637, 642 (2010). The dissent's posited reason for the statement does not change our conclusion: the trial court abused its discretion when it permitted the prosecution to read to the jury the entirety of the statement Clark signed.

¶ 41 Courts exclude prior consistent statements because of their unfair prejudicial effect:

"The danger in prior consistent statements is that a jury is likely to attach disproportionate significance to them. People tend to believe that which is repeated most often, regardless of its intrinsic merit, and repetition lends credibility to testimony that it might not otherwise deserve. [Citation.] For this reason, several courts have found that the erroneous admission of a prior consistent statement constitutes reversible error. [Citations.]

The admission of a statement used to bolster the sagging credibility of a witness is reversible error when the witness' in-court testimony is crucial." *People v. Smith*, 139 Ill. App. 3d 21, 33-34 (1985).

¶ 42 We need not here decide whether the erroneous admission of the written statement into evidence, standing alone, amounts to reversible error. We will assess the prejudicial effect of

the error in light of the cumulative effect of all trial errors. *People v. Fultz*, 2012 IL App (2d) 101101, ¶ 54.

¶ 43                                    Judge as Advocate

¶ 44        Wiggins points to three instances in which the trial judge acted more as an advocate for the State than as an impartial arbiter. Twice the judge interposed objections on behalf of the State, and both times he sustained his own objections. The judge also completed the State's examination of Barnes, asking Barnes if he ever brought to the attention of police or the State's Attorney's Office the facts stated in the statement Barnes signed in the office of Swift's attorney. The judge further signaled to the jury his attitude towards the defense when he referred to the prosecution's redirect examination of Barnes as "what we just did," and when he said to Swift's counsel, in front of the jury, "watch yourself, man."

¶ 45        The State contends that we should not review the judge's conduct because defense counsel did not object at trial to the judge's comments and actions. Our supreme court confronted a similar situation in *People v. Sprinkle*, 27 Ill. 2d 398 (1963). The *Sprinkle* court said:

> "The conduct complained of here consists of actions of the trial judge. The making of an objection to questions or comments by a judge poses a practical problem for the trial lawyer. It can prove embarrassing to the lawyer, but, more importantly, assuming that most juries view most judges with some degree of respect, and accord to them a knowledge of law somewhat superior to that of the attorneys practicing before the judge, the lawyer who objects to a comment or question by the judge may find himself viewed with considerable suspicion and skepticism by

the very group whom he is trying to convert to his client's view of the facts, thereby perhaps irreparably damaging his client's interests. If he fails to object, he may, on appeal, be faced, as defendant here is, with the claim that his failure to act has precluded consideration of the error, and it is not always a sufficient answer to this situation to say that the objection can be made and ruling secured outside the hearing of the jury. It is particularly incumbent upon the trial judge to exercise a higher degree of care in his comments regarding, or interrogations of, witnesses before a jury in order to avoid influencing the jurors to any extent, and we therefore hold that a less rigid application of the rule requiring timely and proper objection and preservation of rulings thereon should prevail where the basis for the objection is the conduct of the trial judge than is otherwise required." *Sprinkle*, 27 Ill. 2d at 400-01.

The objectionable comments here all took place in open court where timely objections may have biased the jury against the defense attorneys and their clients. Following *Sprinkle*, we will review the alleged errors despite the failure to object, because a fair trial before a neutral arbiter "is a fundamental requirement in a criminal prosecution and when such requirement is not met, it amounts to a denial of due process of law." *People v. Finn*, 17 Ill. 2d 614, 617 (1959).

¶ 46 The trial judge has discretion to raise objections and to question witnesses. *People v. Marino*, 414 Ill. 445, 450 (1953). However,

"While the court had a wide discretion in the conduct of a trial, it must not invade the province of the jury by making comments, insinuations or suggestions

13

indicative of belief or disbelief in the integrity or credibility of a witness. [Citations.] In all criminal prosecutions, the accused persons, guilty or innocent, are entitled to a fair and impartial trial by jury. A fair trial contemplates that the jury will, alone, fulfill its duty of determining the facts, and it is not the province of the judge, in a criminal case, to express by word or indicate by conduct, in the jury's hearing, any opinion upon the facts. [Citation.] While it is true that a judge has a right to question witnesses or call other witnesses to the stand in order to elicit the truth or to bring enlightenment on material issues which seem obscure, he must do it in a fair and impartial manner, without showing bias or prejudice against either party. [Citation.] Jurors are ever watchful of the attitude of the trial judge and his influence upon them is necessarily and properly of great weight, thus his lightest word or intimation is received with deference and may prove controlling. In a criminal trial, a hostile attitude toward an accused, or his witnesses, is very apt to influence the jury in arriving at its verdict." *Marino*, 414 Ill. at 450-51.

¶ 47      The judge's questions here did not clarify Barnes's testimony about the shooting and what Barnes saw on March 19, 2011. The questions only presented to the jury a new basis for finding Barnes's testimony at trial less credible.

¶ 48      The dissent finds that the judge's *sua sponte* objections properly ensured that the jury heard only admissible evidence. During recross-examination of Barnes, the prosecutor objected to one of defense counsel's questions as "[i]mpeaching." The objection made no sense. A defense attorney may try to impeach a witness for the State through cross-examination. *People v. Collins*, 106 Ill. 2d 237, 269 (1985). Rather than ruling on the

14

objection, the judge raised his own objection to the question as beyond the scope of redirect examination.  Scope objections prevent the jury from hearing relevant, admissible testimony, as a sustained scope objection precludes the testimony solely on the basis of the attorney's failure to ask the question at the correct time.  See *People v. Chambers*, 179 Ill. App. 3d 565, 577 (1989).  The court's first *sua sponte* objection helped the prosecutor find a way to prevent the jury from hearing relevant, admissible evidence defense counsel sought to elicit.

¶ 49    The judge's second *sua sponte* objection arose during cross-examination of an assistant State's Attorney, when defense counsel sought to show that investigators quickly curtailed investigation into the shooting without interviewing the available witnesses.  The court did not question the witness about whether she knew about the proper procedure for conducting investigations.  This court lacks the assurance the trial judge showed in asserting that an assistant State's Attorney, whose work always closely involves the police and their investigations, lacks sufficient knowledge to testify about proper investigatory procedures. See *People v. Brown*, 253 Ill. App. 3d 165, 178 (1993). Again, the judge did not design the objection to prevent the jury from hearing inadmissible evidence–he foreclosed any effort to find out the extent of the witness's knowledge, when such an effort could have shown that defense counsel's questions would elicit admissible testimony.  The judge's *sua sponte* objection precluded the jury from hearing potentially admissible evidence that might have helped defense counsel make a better case for the defense.

¶ 50    We find that the trial judge abandoned his role as neutral arbiter, when he interposed objections on behalf of the State (see *Pavilon v. Kaferly*, 204 Ill. App. 3d 235, 252 (1990)),

15

and when he questioned Barnes in a manner designed to impeach Barnes's trial testimony. See *Sprinkle*, 27 Ill. 2d at 401-02. We find that he further indicated to the jury a preference for the prosecution when he said to defense counsel, "watch yourself, man," and when he referred to the State's redirect examination of Barnes as "what we just did."

¶ 51    The dissent finds that "we" could refer to both parties' attorneys and the court collectively. But when "what we just did" refers to the questioning that preceded defense counsel's recross-examination of the witness, the phrase establishes an opposition between "what we just did" and what defense counsel is doing–implicitly making defense counsel and the defendant not part of "we."

¶ 52    To determine the prejudicial effect of the judge's conduct, we consider the cumulative effect of (1) the interposed objections, (2) the impeachment of Barnes, (3) the remarks to defense counsel, (4) the suggestion that the judge identified himself as part of the prosecution, and (5) the admission into evidence of Clark's prior statement, in its entirety, about the incident. See *People v. Whitlow*, 89 Ill. 2d 322, 341 (1982). No physical evidence tied either Swift or Wiggins to the crime scene. Two of the State's three key witnesses renounced the statements they signed and gave testimony that did not support a finding that Wiggins or Swift committed the crime charged. The State's third key witness, Clark, altered one significant detail from his written statement. To find Wiggins guilty, the jury needed to rely either on the testimony of Clark, or on the statements Barnes and Ruffin signed at the police station. The court admitted inadmissible evidence when it permitted the prosecution to read to the jury Clark's statement to bolster his testimony, increasing the likelihood the jury would think it credible and thereby prejudicing Wiggins. For the jury to rely on the

16

signed statements of Barnes and Ruffin, the jury needed to reject their trial testimony disavowing those statements. Thus, the jury would need to find both that Barnes and Ruffin lied when they testified under oath, and that Barnes and Ruffin were sufficiently reliable that the jurors could believe their signed statements.

¶ 53     We find the evidence closely balanced. The judge's errors of acting as advocate for the State, interposing objections for the State, completing the State's impeachment of a witness, and subtly threatening defense counsel before the jury, while permitting the State to read into evidence all of the extensive portions of a key witness's out-of-court statement consistent with that witness's trial testimony, served to deprive Wiggins of a fair trial. We reverse Wiggins' conviction and remand for a new trial. In light of our resolution of this issue, we need not address Wiggins' arguments about ineffective assistance of counsel or his sentence.

¶ 54                                   Swift's Appeal

¶ 55     Most of the considerations concerning Wiggins' trial apply equally to Swift's trial, as the State chose to try the two defendants simultaneously before a single jury. However, Swift's attorney has not raised on appeal the issues raised by Wiggins' appellate counsel. Swift contends (1) the State failed to present sufficient evidence to justify the conviction; (2) prosecutorial misconduct in closing argument denied him a fair trial; (3) the trial judge improperly questioned Barnes; and (4) the trial judge imposed an excessive sentence.

¶ 56                           Sufficiency of the Evidence

¶ 57     We find the evidence against Swift sufficient to support his conviction for the same reason we found the evidence against Wiggins sufficient. The jury could use the testimony of Clark and the signed statements of Barnes, Ruffin and Clark as substantive evidence.

17

According to those statements, Swift argued with Barnes about which gang could sell drugs at 51st and Ada, and when they failed to reach an agreement, Swift said to Wiggins, "handle this." In the context of the dispute, the jurors could infer that Swift intended for Wiggins to handle the matter by killing Barnes. The evidence supports holding Swift accountable for the attempt to murder Barnes. See *People v. Roppo*, 234 Ill. App. 3d 116, 126-27 (1992).

¶ 58                                  Closing Argument

¶ 59    Swift points to a single remark in closing argument as grounds for reversal. The prosecutor accused Swift's counsel of trying to sell the jury "a bill of goods." The trial judge sustained defense counsel's prompt objection to the remark. As our supreme court said in *People v. Moore*, 171 Ill. 2d 74, 105-06 (1996), "[t]he act of sustaining an objection and properly admonishing the jury is usually viewed as sufficient to cure any prejudice." We do not see the single remark in this argument as so severely prejudicial as to require a retrial, especially because the trial court sustained a prompt objection to the remark.

¶ 60                                  Questioning Barnes

¶ 61    Swift argues that the judge became an advocate for the State when the judge questioned Barnes as to whether he told police and the State's Attorney that the statement he signed at the police station included lies. We find the questions improper, as the judge showed that he did not believe Barnes's testimony at trial by seeking to impeach it. In the context of the entire trial, where the trial judge sustained his own objections to defense counsel's questions, and said to defense counsel, before the jury, "watch yourself, man," and unfairly permitted the prosecutor to read to the jury prior consistent statements of a key witness, we find that the questioning of Barnes could have weighed heavily with the jury.

¶ 62   The evidence against Swift balances very closely with the evidence in his favor. Neither Ruffin nor Barnes testified that Swift appeared at the scene of the shooting. Clark saw Swift there, but did "[n]ot quite" hear him say anything to Wiggins before Wiggins started shooting. The jurors could rely on the out-of-court statements of all three witnesses–but to do so, the jurors needed to find credible the statements of three witnesses who willingly lied under oath at trial. Because of the closely balanced evidence, we find that the questioning of Barnes requires reversal of the conviction.

¶ 63   Because the trial judge's advocacy for the State also requires reversal of Swift's conviction, we need not address Swift's arguments for reversal of the sentence.

¶ 64                                            CONCLUSION

¶ 65   In this case with closely balanced evidence against both defendants, the trial judge committed reversible error by permitting the prosecution to read to the jury the prior consistent parts of the statement Clark signed; by interposing and sustaining his own objections to defense questions; by saying to defense counsel, in front of the jury, "watch yourself, man"; by signaling to the jury the judge's identification with the prosecution; and by questioning a witness in a manner that conveyed his disbelief in the witness's testimony in court. We find the evidence sufficient to sustain the convictions of both defendants. Accordingly, we reverse the convictions and remand for new trials.

¶ 66   Reversed and remanded.

¶ 67    Liu, J., dissenting:

¶ 68    I agree with the majority that the evidence was sufficient to sustain the convictions of both defendants and that the State's remark in closing argument did not deprive defendants of a fair trial. With respect to the remainder of the majority's conclusions, however, I do not agree that the court erred in admitting Clark's statement or that it abandoned its role as neutral arbiter.

¶ 69                    A. Admission of Clark's Statement

¶ 70    First, the majority assigns error to the trial court's admission of the typewritten statement that Clark signed after relaying his account of the shooting to Assistant State's Attorney (ASA) Krystyn Dilillo on March 22, 2011, because most of the statement was consistent with his testimony at trial. As a general rule, evidentiary rulings are within the trial court's sound discretion and will only be reversed for abuse of discretion, where the ruling is "arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). In reviewing the document that the court admitted, I agree with the majority's finding that Clark's testimony was "largely consistent" with the content of his typewritten statement. Taking all of the circumstances surrounding Clark's testimony into perspective, however, the record supports a finding that the trial court did not abuse its discretion by admitting the statement in its entirety.

¶ 71    Out-of-court statements made prior to trial are generally inadmissible for the purpose of corroborating trial testimony or rehabilitating a witness. *People v. McWhite*, 399 Ill. App. 3d 637, 641 (2010) (citing *People v. Cuadrado*, 214 Ill. 2d 79, 90 (2005); *People v. Heard*, 187 Ill. 2d 36, 70 (1999)). This rule is necessary precisely for the reason pointed out by the majority: because a jury may "tend to believe that which is repeated most often, regardless of its intrinsic

merit, and repetition lends credibility to testimony that it might not otherwise deserve." *People v. Smith*, 139 Ill. App. 3d 21, 33 (1985). A narrow exception exists, however, which permits the admission of prior consistent statements to rebut a charge or an inference that the witness recently fabricated trial testimony or had a motive to testify falsely. *People v. Williams*, 147 Ill. 2d 173, 227 (1991); *McWhite*, 399 Ill. App. 3d at 641. Here, that exception applied. The trial court's admission of Clark's prior consistent statement was not unreasonable because it served to rebut a charge or an inference that his testimony was of recent fabrication or that he was motivated to testify falsely.

¶ 72    During the trial, defense counsel questioned Clark extensively on a possible recent motive to testify falsely. On cross-examination, Clark admitted that he was convicted possession of a controlled substance in 2010, that he was sentenced to probation, and that at the time of trial he was charged with a violation of that probation. The following exchange then occurred between Wiggins' defense counsel and Clark:

> "Q. In fact, you're scheduled to stand trial tomorrow on a
>
> criminal trespass to land case; is that right?
>
> A. Correct.
>
> Q. And so we're clear, since you are accused of violating
>
> your probation, you stand the possibility of being resentenced on
>
> the case that you are on probation for; is that right?
>
> A. Correct.
>
> Q. That could be anywhere from one to six years in prison;
>
> is that right?

A. Correct.

Q. You don't want to go to prison, do you?

A. Whatever my judge sentence [*sic*]. It's up to my judge.

Q. But being honest today, you don't want to go to prison; is that right?

A. Correct.

Q. It behooves you to make the State happy today; is that right?

A. Correct.

Q. Because you're on trial tomorrow; is that right?

A. Correct.

\* \* \*

Q. After you gave your statement [to the police], you were allowed to leave that little small room you described earlier; is that correct?

A. Correct.

Q. So what what [*sic*] you aimed to accomplish worked, you got to go home; is that right?

A. Correct.

Q. It's your goal tomorrow to go home, too, isn't it?

A. Incorrect."

¶ 73    Upon redirect, Clark acknowledged that he did not have any deal with the State in exchange for his testimony at trial. Thereafter, during recross examination, a similar exchange again occurred between Wiggins' defense counsel and Clark:

"Q. In about 20 hours, you stand the possibility of being told you have to go to prison for one to six years; is that right?

A. Tomorrow is—the case I'll be tried for tomorrow is criminal trespassing.

Q. When do you go back to court in front of the Judge upon which you're on probation?

A. The 3rd, December 3rd.

Q. That's next week; is that right?

A. Correct.

Q. At that time, you stand the very real possibility of going to prison from one to six years; is that right?

A. Possibility, correct.

Q. You don't want that to happen; is that right?

A. That's right."

¶ 74    Presumably, the purpose of this line of questioning was to elicit Clark's acknowledgment that he was going to be prosecuted in two matters within days after testifying in defendants' trial. In addition, Clark's admissions that: (1) after he gave a statement implicating defendants in the shooting he was "allowed to leave that little room" and "got to go home"—which was what his goal was during the time he provided his statement to the assistant State's Attorney; (2) he was

facing the "very real possibility of going to prison from one to six years"; and (3) it "behoove[d] [him] to make the State happy" during the State's prosecution of defendants in this trial, gave rise to an inference that Clark had a motive to testify falsely to curry favor with the State. See *Williams*, 147 Ill. 2d at 227 (observing that the defense "[c]learly *** raised an inference that [a witness's] trial testimony was motivated by expectations of leniency and was of recent fabrication"). Under these circumstances, the trial court did not err in admitting Clark's statement because it allowed the State to rebut the charge or inference of fabricated or false testimony based on Clark's motivation to avoid jail or a conviction. I cannot conclude that no reasonable trial judge would have admitted Clark's prior consistent statement and, therefore, I find that the court did not abuse its discretion. "Reasonable minds can disagree about whether certain evidence is admissible without requiring a reversal of a trial court's evidentiary ruling under the abuse of discretion standard." *People v. Chambers*, 2011 IL App (3d) 090949, ¶ 10.

¶ 75                              B. The Trial Court as Neutral Arbiter

¶ 76     Second, the majority finds that, instead of limiting its role as an impartial arbiter during the proceedings, it acted improperly as an advocate for the State and deprived defendants of a fair trial. Although defendants did not object to the court's alleged improprieties during the trial, the majority correctly reviews the question of the court's impartiality under the *Sprinkle* doctrine. *People v. Sprinkle*, 27 Ill. 2d 398, 400-01 (1963). Notwithstanding, I respectfully disagree with the majority's conclusion that "the trial judge abandoned his role as neutral arbiter" when the judge: (1) directed questions to the witness; (2) interposed objections during impeachment of the witness; (3) referred to the examination of the witness as "what we just did"; and (4) gave an admonishment through the statement, "watch yourself, man."

¶ 77                                    1. Cross-examination of Barnes

¶ 78    According to the majority, the trial court inserted itself into Barnes's cross-examination by asking questions that "did not clarify Barnes's testimony about the shooting and what Barnes saw on March 19, 2011" and were, instead, "designed to impeach Barnes's trial testimony." The trial court has the authority to question witnesses in order to elicit the truth or to bring enlightenment on material issues that seem obscure. *People v. Palmer*, 27 Ill. 2d 311, 314 (1963); see also Ill. R. Evid. 614(b) (eff. Jan. 1, 2011) ("The court may interrogate witnesses, whether called by itself or by a party."). Whether such examination has been properly conducted, however, "must be determined by the circumstances of each case, and rests largely in the discretion of the trial court." *Palmer*, 27 Ill. 2d at 315. Given the nature of the trial court's questions, it was not unreasonable for the court to elicit information that related directly to, or clarified, Barnes's immediately preceding testimony.

¶ 79    On direct examination, Barnes testified that, in his interview with police and Assistant State's Attorney Hamelly (who took his statement), he identified Wiggins as the shooter and Swift as the person who ordered the shooting. Barnes indicated, however, that he subsequently contacted Swift's counsel and signed another document that contained the "truth." This led to the following exchange between the prosecutor and Barnes and, later, between the trial court and Barnes:

> "Q. What's contained in that document, that's not what you
>
> told the detectives; is it?
>
> A. No, it is not.
>
> Q. It is not what you told ASA Jen Hamelly; is it?

25

A. No.

STATE: One moment, your Honor.

THE COURT: Okay. This version of the events contained in the document that you signed as prepared by [Swift's counsel], did you ever reach out to the police and tell them about the facts contained in the document?

A. No, I never told the police anything.

Q. Did you ever contact the Cook County State's Attorney's Office and tell them about the facts contained in that affidavit?

A. No."

¶ 80 The majority finds that the trial court's questions "did not clarify Barnes's testimony about the shooting and what Barnes saw on March 19, 2011." I disagree. The testimony elicited by the court specifically addressed a question left open by the State's examination: whether the police or the State's Attorney's office had been informed that the victim had changed his story. The State's questions focused on whether Barnes presented his "alternative" account of the shooting during his initial interview with the detectives and ASA Hamelly, and Barnes admitted that he did not. The trial court then asked whether Barnes informed the police or the State's Attorney's office *at any time* that he had an "alternative" account of the shooting incident. The trial court's questions were a natural follow-up to the State's two questions. Furthermore, Barnes's responses to the trial court's questions clarified for the jury what information the authorities were acting on and provided context for the jury to evaluate the account Barnes later gave to defense counsel. The trial court did not " 'assume the role of prosecutor merely because

26

[its] questions solicit[ed] evidence material to the State's case.' " (Internal quotation marks omitted.) *People v. Harris*, 384 Ill. App. 3d 551, 561 (2008) (quoting *People v. Smith*, 299 Ill. App. 3d 1056, 1062 (1998)).

¶ 81    I believe that *Sprinkle*, relied upon by the majority, is distinguishable from this case as the trial court's questioning of Barnes did not at all resemble the conduct of the trial court in *Sprinkle*. In *Sprinkle*, the trial court told a witness, " 'I think you are marvelous.' " *Sprinkle*, 27 Ill. 2d at 401. Then, when the witness was unable to identify the defendant, the court stated that " '[t]he first time you have seen this man, *since that time*, was today,' " which implied that the witness had seen the defendant previously, *i.e.*, during the crime, and suggested "that the defendant was actually the criminal." (Emphasis added.) *Id.* Adding to the cumulative impact of the judge's questionable remarks in *Sprinkle* were instances in which the judge asked the defendant's father, " 'How many times has your son been in a lawsuit?' " and stated, " 'You are quite familiar with court procedure, how trials are conducted?' " *Id.* at 402. The court's comments in *Sprinkle* collectively served to draw attention to the fact "that the defendant was a frequent law violator, and that the father was well acquainted with trial court procedure." *Id*. In contrast, here, the trial court simply asked two questions designed to elicit the truth and the court did not abandon its role as neutral arbiter in asking these questions.

¶ 82                    2. The trial court's *sua sponte* objections

¶ 83    The majority also finds that the court advocated for the State when it twice interposed objections on behalf of the State and sustained those objections. I disagree with the conclusion that the court acted improperly in ruling on the admissibility of certain testimony, even if the objection was raised by the court *sua sponte*. "[A] court is permitted to make rulings without

objections from counsel." *People v. Thigpen*, 306 Ill. App. 3d 29, 40 (1999). As such, the court is authorized to intervene when necessary to ensure that only admissible evidence goes before the jury.

¶ 84   Defendants' reliance on *People v. Kuntz*, 239 Ill. App. 3d 587 (1993), is unavailing. In that case, defense counsel argued in closing that the State failed to establish that a breathalyzer machine was working properly when it was administered to defendant. *Id.* The trial court, *sua sponte*, asked the State if it wanted a continuance to bring in the testing logs and allowed the State to reopen its case and present additional evidence. *Id.* On review, we found that "the trial judge impermissibly acted as an advocate when he prompted the State to seek a continuance and present additional evidence the following day." *Id.* at 592.

¶ 85   In this case, the trial court sustained an objection by the State on the grounds that the question was beyond the scope of the redirect examination, even though the State had objected to the question on different grounds, *i.e.*, that the question was impeaching. The court then sustained its own objection when a witness was asked to testify to matters beyond her knowledge.   Because the court was authorized to determine whether the evidence being introduced was admissible, I find no error in the court's ruling or in its conduct.

¶ 86                              3. The trial court's remarks

¶ 87   Lastly, the majority finds that certain remarks of the court showed that the judge was acting as an advocate for the State as opposed to a neutral arbiter. According to the majority, "[t]he judge *** signaled to the jury his attitude towards the defense when he referred to the prosecution's redirect examination of Barnes as 'what we just did,' and when he said to Swift's counsel, in front of the jury, 'watch yourself, man.' " In context, the first of these remarks was

28

innocuous, while the second was warranted based on counsel's prior conduct. I cannot agree with the majority's conclusion that these comments were error.

¶ 88    During defense counsel's recross examination of Barnes, Swift's defense counsel asked a question about Barnes's handwritten statement to the Assistant State's Attorney. The State objected and the following exchange occurred:

"STATE: Objection, your Honor.

THE COURT: Basis.

STATE: Impeaching.

THE COURT: Well, the Court's question is[,] is it within

the scope of what we just did?

DEFENSE COUNSEL: Yes, I think.

THE COURT: Okay. State, what is your response?

STATE: It is not.

THE COURT: I am going to rule it is beyond the scope. I

am going to sustain the objection at this time."

The majority interprets the court's use of the term "we" as a subtle indication to the jury that the court was aligned with the State.  In this instance, however, the interpretation of the court's reference to the word "we" should be framed within the context of the entire phrase, "what we just did"—specifically, the direct examination that had just taken place in front of the jury. Therefore, the word "we" was used to connote the attorneys and the court *collectively*.

¶ 89    The majority next finds that the trial court showed disdain for the defense when it said "watch yourself, man" to defense counsel during his direct examination of Clark. Again, the

29

comment must be evaluated properly in the actual context in which it was made. During cross-examination, counsel for Swift said he was showing Clark the statement he had given to the ASA. The State objected and the following exchange occurred:

"STATE: Objection.

THE COURT: Basis?

STATE: Your Honor, I don't believe he has the actual statement. I have not seen what he is showing the witness. I don't know if it's marked.

THE COURT: So everybody, any lawyer who is going to approach a witness with an exhibit needs to show opposing counsel what they got, just so there [are] no surprises.

STATE: Judge, I would object. This has a number of counsel's notes and markings on it.

THE COURT: [to defense counsel] *** [I]t has notes and markings on it?

DEFENSE COUNSEL: It's my exhibit.

THE COURT: Yeah. Well, okay, tell you what, watch yourself, man.

I'm going to let you use this right now. Go ahead."

The record shows that this was the second time in which counsel sought to show a witness a document—albeit one designated a trial exhibit—that contained counsel's personal notes and markings. Earlier, during his cross-examination of Barnes, counsel purported to show Barnes a

30

copy of People's Exhibit No. 7, which was the handwritten statement that Barnes had given the Assistant State's Attorney. At that time, too, the State objected and the following exchange occurred:

> "THE COURT: Basis.
>
> STATE: The document that Counsel is showing to the witness is not People's 7. If Counsel would like People's 7, I can certainly given him People's 7.
>
> THE COURT: Let's use the one that has actually been admitted into evidence, just so there is no confusion.
>
> DEFENSE COUNSEL: Doesn't have my highlighted stuff.
>
> THE COURT: I know that's a problem for you, but that's okay. Let's use the actual exhibit."

¶ 90     Based on this prior exchange with counsel, the trial court's admonishment does not seem impartial or arbitrary; it appears, instead, to be a warning about what was perceived to be a pattern of conduct. I do, nonetheless, share in the concern expressed by defendants that "telling a defense attorney to 'watch it' and referring to him as 'man' " may be "highly demeaning." It is essential that a criminal defendant receives "a fair and impartial trial by jury which is free from improper and prejudicial comments on the part of the trial judge." *People v. Anderson*, 250 Ill. App. 3d 439, 462 (1993). This does not mean, however, that the court's disdain for certain acts during the proceedings results in a show of bias and impartiality that will influence a jury's opinion of the accused. As we have observed:

> "Allegations of judicial bias or prejudice must be viewed in context and should be evaluated in terms of the trial judge's

31

> specific reaction to the events taking place. [Citation.] A judge's display of displeasure or irritation with an attorney's behavior is not necessarily evidence of judicial bias against the defendant or his counsel." *People v. Faria*, 402 Ill. App. 3d 475, 482 (2010).

While *Faria* involved a bench trial and did not present the distinct concern for influencing the jury, the comments made during the trial were not dissimilar in tone, as the trial court admonished the defense counsel: "And don't even start. Don't do that." A judge is obligated to use reasonable efforts to avoid "interjecting opinions, comments, or insinuations reflecting bias toward or against any party." *People v. Garrett*, 276 Ill. App. 3d 702, 712 (1995). No prejudice or bias results where a judge's comments serve a valid purpose, such as cautioning an attorney about certain conduct or representations. See *id.* (Finding no impropriety where judge told counsel " 'Close out your argument, sir. You're wasting your time.' ").

¶ 91    Accordingly, I find that the trial court's admission of Clark's typewritten statement was permissible and the court's conduct during the proceedings was fair and impartial. The judge did not abuse his discretion or abandon his role as a neutral arbiter. Our task is to review the judgment of the trial court, not just the reasoning, and we may affirm the court's judgment on any basis supported by the record. *People v. Rajagopal*, 381 Ill. App. 3d 326, 329 (2008). I would address the remainder of the defendants' claims. For these reasons, I respectfully dissent.